Court of Appeals Case No. 16-7033

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

YORIE VON KAHL,

*Plaintiff -Appellee*,

v.

BUREAU OF NATIONAL AFFAIRS, INC.,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Dist. Ct. No. 1:09-cv-00635-KBJ

## BRIEF FOR *AMICI CURIAE* COALITION OF MEDIA ORGANIZATIONS IN SUPPORT OF DEFENDANT-APPELLANT AND URGING REVERSAL

KEVIN T. BAINE
THOMAS G. HENTOFF
NICHOLAS G. GAMSE
 (*admission pending*)
 WILLIAMS & CONNOLLY LLP
 725 Twelfth Street, N.W.
 Washington, DC  20005
 (202) 434-5000

*Counsel for Amici Curiae*

*(\*Of counsel listed on inside cover)*

# OF COUNSEL

John Zucker
Indira Satyendra
ABC, Inc.
77 W. 66th Street
New York, NY 10023
*Counsel for ABC, Inc.*

Richard A. Bernstein
Sabin, Bermant & Gould LLP
One World Trade Center, 44th Floor
New York, NY 10007
*Counsel for Advance Publications, Inc.*

Dana Rosen
ALM Media, LLC
120 Broadway, 5th Floor
New York, NY 10271
*Counsel for ALM Media, LLC*

Kevin M. Goldberg
Fletcher, Heald & Hildreth, PLC
1300 N. 17th Street, 11th Floor
Arlington, VA 22209
*Counsel for American Society of
News Editors and the Association of
Alternative Newsmedia*

Regina Thomas
Assistant General Counsel
AOL Inc.
22000 AOL Way
Dulles, VA 20166
*Counsel for AOL Inc.*

Liz Hartley
Associated Newspapers Limited
Northcliffe House
2 Derry Street
London, W8 5TT
Great Britain
*Counsel for The Mail On Line*

Karen Kaiser
The Associated Press
450 W. 33rd Street
New York, NY 10001
*Counsel for The Associated Press*

Jonathan Bloom
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
*Counsel for The Association of
American Publishers, Inc.*

Aretae Wyler
Atlantic Media, Inc.
600 New Hampshire Avenue, N.W.
Washington, DC 20037
*Counsel for Atlantic Media, Inc.*

Allison Lucas
Nabiha Syed
BuzzFeed, Inc.
200 Fifth Avenue, 8th Floor
New York, NY 10010
*Counsel for Buzzfeed, Inc.*

David C. Vigilante
Johnita P. Due
Cable News Network, Inc.
1 CNN Center
Atlanta, GA 30303
*Counsel for Cable News Network, Inc.*

Julia Atcherley
The Daily Beast Company LLC
555 W. 18th Street
New York, NY 10011
*Counsel for The Daily Beast
Company LLC*

Matthew Leish
Daily News, LP
4 New York Plaza
New York, NY 10004
*Counsel for Daily News, LP*

Jason P. Conti
Jacob P. Goldstein
Dow Jones & Company, Inc.
1211 Avenue of the Americas
New York, NY 10036
*Counsel for Dow Jones & Company,
Inc.*

David M. Giles
The E.W. Scripps Company
312 Walnut Street, Suite 2800
Cincinnati, OH 45202
*Counsel for The E.W. Scripps
Company*

Lynn Oberlander
First Look Media Works, Inc.
18th Floor
114 Fifth Avenue
New York, NY 10011
*Counsel for First Look Media Works,
Inc.*

MariaRosa Cartolano
Forbes Media LLC
60 Fifth Avenue
New York, NY 10011
*Counsel for Forbes Media LLC*

Susan Seager
Fox Group Legal
2121 Avenue of the Stars
Los Angeles, CA 90067
*Counsel for Fox Entertainment
Group, LLC*

Barbara Wall
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107
*Counsel for Gannett Co., Inc.*

Heather Dietrick
Courtenay O'Connor
Gawker Media LLC
114 Fifth Avenue
New York, NY 10011
*Counsel for Gawker Media LLC*

Carol Fein Ross
Hachette Book Group, Inc.
1290 Avenue of the Americas
New York, NY 10104
*Counsel for Hachette Book Group, Inc.*

Jonathan Donnellan
Kristina Findikyan
Hearst Corporation
Office of General Counsel
300 W. 57th Street, 40th Floor
New York, NY 10019
*Counsel for Hearst Corporation*

George Freeman
Media Law Resource Center
520 Eighth Avenue
North Tower, 20th Floor
New York, NY 10018
*Counsel for Media Law Resource
Center*

Charles D. Tobin
Holland & Knight LLP
800 17th Street, N.W.
Suite 1100
Washington, DC 20006
*Counsel for The National Press Club*

Jonathan Hart
Ashley Messenger
Micah Ratner
National Public Radio, Inc.
1111 North Capitol Street, N.E.
Washington, DC 20002
*Counsel for National Public Radio, Inc.*

Beth R. Lobel, Esq.
NBCUniversal Media, LLC
30 Rockefeller Plaza
New York, NY 10112
*Counsel for NBCUniversal Media, LLC*

David McCraw
V.P./Assistant General Counsel
The New York Times Company
620 Eighth Avenue
New York, NY 10018
*Counsel for The New York Times*
*Company*

Eugenie C. Gavenchak
News Corporation
1211 Avenue of the Americas
New York, NY 10036
*Counsel for News Corporation and*
*NYP Holdings, Inc.*

Kurt Wimmer
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004
*Counsel for the Newspaper*
*Association of America*

Bruce D. Brown
Gregg P. Leslie
The Reporters Committee for
Freedom of the Press
1156 15th Street, N.W., Suite 1250
Washington, DC  20005
*Counsel for The Reporters*
*Committee for Freedom of the Press*

Andrew Lachow
Time Inc.
225 Liberty Street
New York, NY 10281
*Counsel for Time Inc.*

Karen H. Flax
Tribune Publishing Company
435 North Michigan Avenue
Chicago, IL 60611
Jeff Glasser
Tribune Publishing Company
202 W. 1st Street
Los Angeles, CA 90012
*Counsel for Tribune Publishing*
*Company*

Lauren Fisher
Vox Media, Inc.
1201 Connecticut Avenue, N.W.,
Floor 11
Washington, DC 20036
*Counsel for Vox Media, Inc*

John B. Kennedy
James A. McLaughlin
Kalea S. Clark
The Washington Post
1301 K Street, N.W.
Washington, DC 20071
*Counsel for The Washington Post*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), *Amici* state as follows:

### A.    Parties and *Amici*

Except for the following members of the *Amici Curiae* Coalition of Media Organizations, all parties, intervenors, and *amici* appearing before the district court and in this Court are identified in the Brief for Defendant-Appellant:

ABC, Inc. is an indirect, wholly owned subsidiary of The Walt Disney Company, a publicly traded corporation.

Advance Publications, Inc. has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

ALM Media, LLC is privately owned, and no publicly held corporation owns 10% or more of its stock.

The American Society of News Editors ("ASNE") is a private, non-stock corporation that has no parent.

AOL Inc. is a wholly owned subsidiary of Verizon Communications Inc., which is a publicly traded corporation.

Associated Newspapers Limited is an indirect, wholly owned subsidiary of Daily Mail and General Trust PLC, a publicly traded corporation.

The Associated Press is a global news agency organized as a mutual news cooperative under the New York Not-For-Profit Corporation law.  It is not publicly traded.

The Association of Alternative Newsmedia ("AAN") is a private, non-stock corporation that has no parent.

The Association of American Publishers, Inc. is a nonprofit organization that has no parent and issues no stock.

Atlantic Media, Inc. is a privately held, integrated media company, and no publicly held corporation owns 10% or more of its stock.

BuzzFeed Inc. is a privately owned company.  No publicly held corporation owns 10% or more of its stock.

Cable News Network, Inc. is a wholly owned subsidiary of Turner Broadcasting System, Inc., which itself is a wholly owned subsidiary of Time Warner Inc., a publicly traded corporation.

The Daily Beast Company LLC is owned by IAC/InterActiveCorp, a publicly traded company, and the Sidney Harman Trust, with IAC holding a controlling interest.

Daily News, LP is a limited partnership, the general partner of which is New DN Company, a privately-held corporation. No publicly held corporation holds an interest of 10% or more in Daily News, L.P.

Dow Jones & Company, Inc. News Corporation, a publicly held company, is the indirect parent corporation of Dow Jones & Company, Inc. Ruby Newco, LLC, a subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. No publicly held company directly owns 10% or more of the stock of Dow Jones.

The E.W. Scripps Company is a publicly traded company with no parent company. No individual stockholder owns more than 10% of its stock.

First Look Media Works, Inc. is a non-profit non-stock corporation organized under the laws of Delaware. No publicly held corporation holds an interest of 10% or more in First Look Media Works, Inc.

Forbes LLC has no parent corporation and no company owns 10% or more of its stock.

iii

Fox Entertainment Group, LLC is a wholly owned, indirect subsidiary of Twenty-First Century Fox, Inc., a publicly held company.  No publicly held company owns 10% or more of Twenty-First Century Fox, Inc.

Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.  No publicly held corporation holds 10% or more of its stock.

Gawker Media LLC is privately held and wholly owned by privately held Gawker Media Group, Inc.  No publicly held corporation holds an interest of 10% or more in Gawker Media LLC.

Hachette Book Group, Inc. is a wholly owned subsidiary of Hachette Livre USA, Inc.  Hachette Livre USA, Inc. is a wholly owned subsidiary of Lagardere North America Inc.  Lagardere North America Inc. is a wholly owned subsidiary of Lagardere Media (formerly Hachette SAS).  Lagardere Media is a wholly owned subsidiary of Lagardere SCA, which is traded on the Paris stock exchange.

Hearst Corporation is privately held and no publicly held corporation owns 10% or more of Hearst Corporation.

The Media Law Resource Center has no parent corporation and issues no stock.

iv

MPA – The Association of Magazine Media has no parent companies, and no publicly held company owns more than 10% of its stock.

The National Press Club is a not-for-profit corporation that has no parent company and issues no stock.

National Public Radio, Inc. is a privately supported, not-for-profit membership organization that has no parent company and issues no stock.

NBCUniversal Media, LLC.  Comcast Corporation and its consolidated subsidiaries own 100% of the common equity interests of NBCUniversal Media, LLC.

The New York Times Company, a publicly traded company, has no parent company.  One publicly held corporation, Grupo Finaciero Inbursa, S.A.B. de C.V., owns more than 10 percent of its stock through affiliated entities.

News Corporation is a public company and no publicly held corporation owns 10% or more of its shares.

Newspaper Association of America is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia.  It has no parent company.

NYP Holdings, Inc. is an indirect wholly owned subsidiary of News Corporation.

Online News Association is a not-for-profit organization. It has no parent corporation.

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

Society of Professional Journalists is a non-stock corporation with no parent company.

Time Inc. does not have a parent entity. JP Morgan Chase & Co. is a publicly traded corporation that owns 10% or more of its stock.

Tribune Publishing Company, LLC is publicly held. Merrick Media, LLC, Oaktree Capital Management, L.P., and Primecap Management Company each own 10 percent or more of Tribune Publishing Company's stock.

Vox Media, Inc. has no parent corporation. Each of NBCUniversal Media, LLC and Comcast Ventures, LP, direct and indirect subsidiaries of publicly traded Comcast Corporation, owns 10% or more of shares of Vox Media, Inc.

WP Company LLC d/b/a The Washington Post is a wholly owned subsidiary of Nash Holdings LLC. Nash Holdings LLC is privately held and does not have any outstanding securities in the hands of the public.

## B.    Rulings Under Review

References to the rulings at issue appear in the Brief for Defendant-Appellant.

## C.    Related Cases

Related case information appears in the Brief for Defendant-Appellant.

Dated: May 18, 2016

/s/ Kevin T. Baine
Kevin T. Baine

# TABLE OF CONTENTS

IDENTITY AND INTEREST OF *AMICI* .............................................................1

BACKGROUND...........................................................................................15

SUMMARY OF ARGUMENT.........................................................................17

ARGUMENT................................................................................................19

I.  THE FIRST AMENDMENT GUARANTEES "BREATHING SPACE" IN ACTUAL MALICE CASES TO PROTECT AGAINST LIABILITY FOR GOOD-FAITH MISTAKES...................19

II.  EARLY DISPOSITION OF ACTUAL MALICE CASES HELPS PREVENT UNDUE BURDENS ON THE EXERCISE OF FREE SPEECH .........................................................25

III.  APPLICATION OF THE ACTUAL MALICE TEST HERE REQUIRES SUMMARY JUDGMENT FOR THE DEFENDANT .........................................................................28

    A.  Summary Judgment Is Required When the Unrebutted Evidence Shows that Any Mistake Was Made in Good Faith..............................................................................29

    B.  Summary Judgment Is Required When a Plaintiff Cannot Prove by "Clear and Convincing Evidence" that a Defendant Made a False Statement with Actual Malice.............33

CONCLUSION............................................................................................35

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................26, 33, 34

*\*Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485
   (1994) ...............................................................................................22, 25, 29

*Curtis Publ'g Co. v. Butts*, 383 U.S. 130 (1967) .....................................................20

*Faltas v. State Newspaper,* 928 F. Supp. 637 (D.S.C. 1996),
   *aff'd*, 155 F.3d 557 (4th Cir. 1998) ....................................................................27

*Farah v. Esquire Magazine*, 736 F.3d 528 (D.C. Cir. 2013)........................18, 26

*Garrison v. Louisiana*, 379 U.S. 64 (1964) ...........................................................20

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)..................................................34

*\*Jankovic v. Int'l Crisis Grp.*, No. 14-7171, --- F.3d ----,
   2016 WL 2640526 (D.C. Cir. May 10, 2016) .....................18, 20, 21, 24, 33-35

*Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003)..........................................35

*Long v. Arcell*, 618 F.2d 1145 (5th Cir. 1980) .......................................................34

*Marcone v. Penthouse Int'l Magazine For Men*, 754 F.2d
   1072 (3d Cir. 1985) .............................................................................................32

*McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501
   (D.C. Cir. 1996) ......................................................................................21, 26, 34

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir.
   2016) .................................................................................................................24, 27

*\*New York Times Co. v. Sullivan*, 376 U.S. 254
   (1964) ..........................................................................1, 17, 18, 20-22, 25, 31

\*Authorities upon which we chiefly rely are marked with asterisks.

*Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556
(5th Cir. 1997)............................................................................30

*\*St. Amant v. Thompson*, 390 U.S. 727 (1968) ..........................20-22, 29, 35

*\*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) (en
banc) .........................................................................1, 19, 21, 29, 34

*\*Time, Inc. v. Pape*, 401 U.S. 279 (1971)................................1, 19, 31, 33

*\*Washington Post Co. v. Keogh*, 365 F.2d 965 (D.C. Cir.
1966) ..................................................................................... 23, 26-28

## STATE CASES

*Chafin v. Gibson*, 213 W. Va. 167 (2003) ....................................27

*Durando v. Nutley Sun*, 209 N.J. 235 (2012) ...............................27, 31

*Freedom Newspapers of Texas v. Cantu*, 168 S.W.3d 847
(Tex. 2005) ................................................................................31

*Khan v. New York Times Co.*, 269 A.D.2d 74 (1st Dep't
2000) ..........................................................................................31

*\*Kipper v. NYP Holdings Co.*, 12 N.Y.3d 348 (2009) ......................23, 32, 33, 35

## CONSTITUTION AND STATUTES

U.S. Const. amend. I..................................................................19

## RULES

Fed. R. App. P. 29......................................................................1, 2

## OTHER AUTHORITIES

Hon. Robert D. Sack, *Sack on Defamation: Libel, Slander
& Related Problems* (4th ed. & supp. 2016)......................................27, 30, 32

Anthony De Rosa, *A Rule for Online News: Errors Are
Inevitable; Lack of Transparency Is Not*, L.A. Times
(Aug. 25, 2015).........................................................................25

x

Scott R. Maier, *Accuracy Matters: A Cross-Market Assessment of Newspaper Error and Credibility*, J&MC Quarterly 533, 547 (Autumn 2005).......................................24

Society of Professional Journalists, *Society of Professional Journalists Code of Ethics* (1996)................................................25

## IDENTITY AND INTEREST OF *AMICI*

*Amici* are thirty-nine leading news publishers and media trade associations.[1] They or their members report and publish news and information across the country and around the world. They include the publisher of the largest newspaper by circulation in this Circuit, The Washington Post. They also include companies whose affiliates run two of the largest television broadcast news operations in this Circuit, WRC and WTTG. *Amici* or their members are often subject to, and regularly threatened with, defamation lawsuits arising from their publications about matters of public concern. They have defended some of this country's most significant libel cases, including *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), *Time, Inc. v. Pape*, 401 U.S. 279 (1971), and *Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) (en banc) (in which The Washington Post was a defendant).

---

[1] No party's counsel authored this brief in whole or part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person, other than *amici curiae*, their members, or their counsel, contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(c)(5).

*Amici* believe that they can offer the Court particular insight into the First Amendment issues presented by this appeal, in which they have significant interest. These issues include the importance of the substantive and procedural protections the First Amendment actual malice test provides at summary judgment for defendants in public figure libel cases. This Court should reaffirm these protections by reversing a district court order that permitted a public figure plaintiff to defeat an actual malice summary judgment motion with no evidence other than a facial comparison of the defendant's summary of a legal document with the ambiguous document on which it was based, and in the face of unrebutted testimony reasonably demonstrating that the difference was the result of a good-faith mistake.

*Amici*, listed below, have concurrently moved for leave to file this brief, pursuant to Fed. R. App. P. 29(a).

ABC, Inc., alone and through its subsidiaries, owns and operates, *inter alia*, ABC News, abcnews.com and local broadcast television stations, including WABC-TV in New York City, which regularly gather and report news to the public. Programs produced and disseminated by ABC News include "World News with Diane Sawyer," "20/20," "Nightline," "Good Morning America" and "This Week."

2

Advance Publications, Inc., directly and through its subsidiaries, publishes more than 20 print and digital magazines with nationwide circulation, local news in print and online in ten states, and leading business journals in over 40 cities throughout the United States. Through its subsidiaries, Advance also owns numerous digital video channels and internet sites.

ALM Media, LLC publishes over 30 national and regional magazines and newspapers, including *The American Lawyer*, *The National Law Journal*, *New York Law Journal* and *Corporate Counsel*, as well as the website Law.com. Many of ALM's publications have long histories reporting on legal issues and serving their local legal communities. ALM's publications have won numerous awards for their coverage of critical national and local legal stories, including many stories that have been later picked up by other national media.

With approximately 300 members, the American Society of News Editors ("ASNE") is an organization that includes directing editors of daily newspapers throughout the Americas. ASNE changed its name in April 2009 to American Society of News Editors and approved broadening its membership to editors of online news providers and academic leaders.

Founded in 1922 as American Society of Newspaper Editors, ASNE is active in a number of areas of interest to top editors with priorities on improving freedom of information, diversity, readership and the credibility of newspapers.

AOL is a media technology company with a mission to connect consumers and creators through open marketplaces. AOL uses data to disrupt content production, distribution and monetization. The company connects publishers with advertisers across its global, programmatic platforms, tapping into Microsoft inventory and original content brands like TechCrunch, The Huffington Post and MAKERS which reach over 500 million monthly global consumers. Within its mobile advertising network alone, AOL has a reach of roughly 800 million users. A subsidiary of Verizon, AOL is shaping the digital future.

Associated Newspapers Limited is a newspaper and website publisher which is home to some of the U.K.'s most popular brands, including Mail Online, the Daily Mail, The Mail on Sunday and Metro. Mail Online is the world's largest English language newspaper website with more than 211.1 million monthly unique visitors globally. It is also America's third biggest

online newspaper with U.S. traffic of 69.4 million monthly unique visitors and almost two million daily visits.

The Associated Press ("AP") is a news cooperative organized under the Not-for-Profit Corporation Law of New York. The AP's members and subscribers include the nation's newspapers, magazines, broadcasters, cable news services and Internet content providers. The AP operates from 280 locations in more than 100 countries. On any given day, AP's content can reach more than half of the world's population.

The Association of Alternative Newsmedia ("AAN") is a not-for-profit trade association for approximately 120 alternative newspapers in North America, including weekly papers like The Village Voice and Washington City Paper. AAN newspapers and their websites provide an editorial alternative to the mainstream press. AAN members have a total weekly circulation of seven million and a reach of over 25 million readers.

The Association of American Publishers, Inc. ("AAP") is the national trade association of the U.S. book publishing industry. AAP's members include most of the major commercial book publishers in the United States, as well as smaller and nonprofit publishers, university presses and scholarly societies. AAP members publish hardcover and paperback books in every

5

field, educational materials for the elementary, secondary, postsecondary and professional markets, scholarly journals, computer software, and electronic products and services. The Association represents an industry whose very existence depends upon the free exercise of rights guaranteed by the First Amendment.

Atlantic Media, Inc. is a privately held, integrated media company that publishes *The Atlantic*, *National Journal*, *Quartz* and *Government Executive*. These award-winning titles address topics in national and international affairs, business, culture, technology and related areas, as well as cover political and public policy issues at federal, state and local levels. *The Atlantic* was founded in 1857 by Oliver Wendell Holmes, Ralph Waldo Emerson, Henry Wadsworth Longfellow and others.

BuzzFeed Inc. is a social news and entertainment company that provides shareable breaking news, original reporting, entertainment, and video across the social web to its global audience of more than 200 million.

Cable News Network, Inc. ("CNN"), a division of Turner Broadcasting System, Inc., a Time Warner Company, is the most trusted source for news and information. Its reach extends to the following: nine cable and satellite television networks; one private place-based network; two radio networks;

wireless devices around the world; CNN Digital Network, the No. 1 network of news websites in the United States; CNN Newsource, the world's most extensively syndicated news service; and strategic international partnerships within both television and the digital media.

The Daily Beast was founded in 2008. Curated to avoid information overload, the site is dedicated to breaking news and sharp commentary. The Daily Beast regularly attracts over 20 million unique online visitors a month.

Daily News, LP publishes the New York Daily News, a daily newspaper that serves primarily the New York City metropolitan area and is the ninth-largest paper in the country by circulation. The Daily News' website, NYDailyNews.com, receives approximately 26 million unique visitors each month.

Dow Jones & Company, Inc. is a global provider of news and business information, delivering content to consumers and organizations around the world across multiple formats, including print, digital, mobile and live events. Dow Jones has produced unrivaled quality content for more than 130 years and today has one of the world's largest newsgathering operations globally. It produces leading publications and products including the flagship Wall Street Journal, America's largest newspaper by paid circulation; Factiva;

Barron's; MarketWatch; Financial News; DJX; Dow Jones Risk & Compliance; Dow Jones Newswires; and Dow Jones VentureSource.

The E.W. Scripps Company serves audiences and businesses through television, radio and digital media brands, with 33 television stations in 24 markets.  Scripps also owns 34 radio stations in eight markets, as well as local and national digital journalism and information businesses, including mobile video news service Newsy and weather app developer WeatherSphere.  Scripps owns and operates an award-winning investigative reporting newsroom in Washington, D.C.

First Look Media Works, Inc. is a new non-profit digital media venture that produces The Intercept, a digital magazine focused on national security reporting.

Forbes LLC is the publisher of Forbes and other leading magazines, including Forbes Life and Forbes Asia, as well as an array of investment newsletters and the leading business website, Forbes.com.  Forbes has been covering American and global business since 1917.

Fox Entertainment Group, LLC, with its subsidiaries, is a diversified global media and entertainment company that produces, licenses, and

distributes content through its cable television network, broadcast television stations, production companies, and motion pictures.

Gannett Co., Inc. is an international news and information company that publishes 108 daily newspapers in the United States and Guam, including USA TODAY.  Each weekday, Gannett's newspapers are distributed to an audience of more than 8 million readers and the digital and mobile products associated with the company's publications serve online content to more than 100 million unique visitors each month.

Gawker Media LLC is the publisher of some of the web's best-loved brands and communities, including the eponymous Gawker, the gadget sensation Gizmodo, and the popular sports site Deadspin.  Founded in 2002, Gawker's sites reach over 100 million readers around the world each month.

Hachette Book Group, Inc. is a leading trade publisher based in New York and a division of Hachette Livre, the third largest trade and educational book publisher in the world.  Hachette Book Group publishes about 1,000 books per year.

Hearst Corporation is one of the nation's largest diversified media and information companies.  Its major interests include ownership of 15 daily and more than 30 weekly newspapers, including the Houston Chronicle, San

Antonio Express-News, San Francisco Chronicle and Albany Times Union; hundreds of magazines around the world, including Good Housekeeping, Cosmopolitan, ELLE and O, The Oprah Magazine; 31 television stations, which reach a combined 18 percent of U.S. viewers; ownership in leading cable networks, including Lifetime, A&E, HISTORY and ESPN; significant holdings in automotive, electronic, and medical/pharmaceutical business information companies; a majority stake in global ratings agency Fitch Group; Internet and marketing services businesses; television production; newspaper features distribution; and real estate.

The Media Law Resource Center, Inc. ("MLRC") is a non-profit professional association for content providers in all media, and for their defense lawyers, providing a wide range of resources on media and content law, as well as policy issues. These include news and analysis of legal, legislative and regulatory developments; litigation resources and practice guides; and national and international media law conferences and meetings. The MLRC also works with its membership to respond to legislative and policy proposals, and speaks to the press and public on media law and First Amendment issues. MPA – The Association of Magazine Media, ("MPA") is the largest industry association for magazine publishers. The MPA,

10

established in 1919, represents over 200 domestic magazine media companies with more than 900 magazine titles. The MPA represents the interests of weekly, monthly and quarterly publications that produce titles on topics that cover politics, religion, sports, industry, and virtually every other interest, avocation or pastime enjoyed by Americans. The MPA has a long history of advocating on First Amendment issues.

The National Press Club is the world's leading professional organization for journalists. Founded in 1908, the Club has 3,100 members representing most major news organizations. The Club defends a free press worldwide. Each year, the Club holds over 2,000 events, including news conferences, luncheons and panels, and more than 250,000 guests come through its doors.

National Public Radio, Inc. is an award-winning producer and distributor of noncommercial news, information, and cultural programming. A privately supported, not-for-profit membership organization, NPR serves an audience of more than 26 million listeners each week via more than 1000 noncommercial, independently operated radio stations, licensed to more than 260 NPR Members and numerous other NPR-affiliated entities. In addition, NPR is reaching an expanding audience via its digital properties, including

NPR.org and NPR's applications, which see more than 30 million unique visitors each month.

NBCUniversal Media, LLC is one of the world's leading media and entertainment companies in the development, production and marketing of news, entertainment and information to a global audience. Among other businesses, NBCUniversal Media, LLC owns and operates the NBC television network, the Spanish-language television network Telemundo, NBC News, several news and entertainment networks, including MSNBC and CNBC, and a television-stations group consisting of owned-and-operated television stations that produce substantial amounts of local news, sports and public affairs programming, including WRC in Washington, DC. NBC News produces the "Today" show, "NBC Nightly News with Lester Holt," "Dateline NBC" and "Meet the Press."

The New York Times Company is the publisher of *The New York Times* and *The International Times*, and operates the news website nytimes.com.

News Corporation is a global, diversified media and information services company whose subsidiaries publish the Wall Street Journal, the New York Post, and other leading news publications.

Newspaper Association of America ("NAA") is a nonprofit organization representing the interests of more than 2,000 newspapers in the United States and Canada.  NAA members account for nearly 90% of the daily newspaper circulation in the United States and a wide range of non-daily newspapers.  The Association focuses on the major issues that affect today's newspaper industry, including protecting the ability of the media to provide the public with news and information on matters of public concern.

NYP Holdings, Inc. is the publisher of the New York Post, one of the most widely circulated newspapers in the United States.

Online News Association ("ONA") is the world's largest association of online journalists.  ONA's mission is to inspire innovation and excellence among journalists to better serve the public.  ONA's more than 2,000 members include news writers, producers, designers, editors, bloggers, technologists, photographers, academics, students and others who produce news for the Internet or other digital delivery systems.  ONA is dedicated to advancing the interests of digital journalists and the public generally by encouraging editorial integrity and independence, journalistic excellence and freedom of expression and access.

The Reporters Committee for Freedom of the Press is a voluntary, unincorporated association of reporters and editors that works to defend the First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided assistance and research in First Amendment and Freedom of Information Act litigation since 1970.

Time Inc. is the largest magazine publisher in the United States. It publishes over 90 titles, including *Time*, *Fortune*, *Sports Illustrated*, *People*, *Entertainment Weekly*, *InStyle* and *Real Simple*. Time Inc. publications reach over 100 million adults, and its websites, which attract more visitors each month than any other publisher, serve close to two billion page views each month.

Tribune Publishing Company is one of the country's leading publishing companies. Tribune Publishing's ten daily publications include the Chicago Tribune, Los Angeles Times, The Baltimore Sun, Sun Sentinel (South Florida), Orlando Sentinel, Hartford Courant, The Morning Call, Daily Press, Capital Gazette, and Carroll County Times. Popular news and information websites, including www.chicagotribune.com and www.latimes.com, complement Tribune Publishing's publishing properties and extend the company's nationwide audience.

Vox Media, Inc. is a modern media company, comprised of eight smart and trusted media brands built in big consumer categories, and reaching hundreds of millions of people each month.  Vox Media is: Vox.com (General News), SB Nation (Sports), Polygon (Gaming), The Verge (Technology and Culture), recode (Technology and Business), Eater (Food and Nightlife), Racked (Shopping, Beauty and Fashion), and Curbed (Real Estate and Home).

WP Company LLC (d/b/a The Washington Post) is publisher of The Washington Post, one of the nation's leading daily newspapers, as well as the website washingtonpost.com, which reaches an online audience of more than 70 million unique visitors per month.

## BACKGROUND

Plaintiff Yorie Von Kahl is serving dual life sentences after being convicted in 1983 of the second degree murders of two United States Marshals.  He filed a defamation lawsuit against The Bureau of National Affairs, Inc. ("BNA") over a one-paragraph summary in BNA's *Criminal Law Reporter* of his 2005 mandamus petition to the Supreme Court, and BNA's later clarification of the summary.

15

Von Kahl alleges that the summary and clarification were defamatory because they misattributed to the sentencing judge a prosecutor's statement that Von Kahl showed a "lack of contrition" for crimes justified by his "religious and philosophical beliefs" (although the judge said elsewhere that Von Kahl "showed no concern for the victims, no concern apparently shown or felt for the victims," *see* Appellant's App. 242-43). The BNA writer and editor admitted the error and presented unrefuted testimony that they misinterpreted a confusingly presented excerpt of the sentencing transcript that Von Kahl had included as an appendix in his mandamus petition. *See* BNA Br. at 8-16 (describing the petition, as well as BNA's summary and subsequent clarification); Appellant's App. 265-68, 283-86 (unrefuted declarations from the writer and editor).

The district court issued multiple pretrial orders, including one in which the court ruled that Von Kahl is a limited purpose public figure for purposes of deciding his libel claim. Appellant's App. 152-53. BNA moved for summary judgment on a number of grounds, including that, as a public figure plaintiff, Von Kahl could not satisfy his burden of demonstrating that BNA made the error with actual malice. The district court denied BNA's motion, holding in relevant part that the "discrepancies" between Von Kahl's

16

mandamus petition and BNA's summary of the petition "are sufficient to create a genuine dispute of material fact regarding whether BNA acted with reckless disregard with respect to the truth or falsity of the statements in its summary." Appellant's App. 334-35. The district court subsequently certified the case for interlocutory appeal, acknowledging that "there is a substantial ground for difference of opinion regarding whether it is sufficient for [Von Kahl] to rely solely on the content of BNA's false statements" to prove his case. Appellant's App. 343.

## <u>SUMMARY OF ARGUMENT</u>

Three important First Amendment principles concerning the protection of publishers writing about public figures underscore why the district court's denial of BNA's actual malice summary judgment motion is legally erroneous and should be reversed.

First, as the Supreme Court recognized in the landmark case *New York Times Co. v. Sullivan*, good-faith errors in disseminating information are "inevitable" in the course of debate in a free society and "must be protected if the freedoms of expression are to have the breathing space that they need to survive." 376 U.S. 254, 271-72 (1964) (ellipsis and quotation marks omitted). The Court designed the actual malice test to be particularly

17

rigorous; the test requires a plaintiff to show that the publisher had "knowledge that [the statement] was false" or acted with "reckless disregard [as to] whether it was false or not," and to make the showing with "convincing clarity." *Id.* at 280, 285-86. In the modern 24/7 news environment, good-faith errors are just as inevitable as they were in 1964, and courts today continue to stress the need to provide sufficient "breathing space" to publishers. *See, e.g.*, *Jankovic v. Int'l Crisis Grp.*, Nos. 14-7171, 14-7178, --- F.3d ----, 2016 WL 2640526, at *3 (D.C. Cir. May 10, 2016).

Second, courts, led by this Court, continue to emphasize that summary disposition of actual malice cases is "essential," because "if a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails." *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (quoting *Wash. Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966)).

Third, the actual malice test requires summary judgment for defendants that have published inaccurate information by reason of a good-faith mistake. Under binding Supreme Court precedent, a good-faith mistake is incapable of satisfying the subjective component of the actual malice test, i.e., that the publisher "in fact entertained serious doubts as to

18

the truth of [the] publication." *Time, Inc. v. Pape*, 401 U.S. 279, 291-92 (1971) (quotation marks omitted).  This is particularly true here in light of the unrefuted testimony of BNA's writer and editor explaining the rational reason for the mistake.  The district court's decision also contained no analysis of the plaintiff's claim under the requisite "clear and convincing" burden of proof, which is "significantly more onerous than the usual preponderance of the evidence standard." *Tavoulareas v. Piro*, 817 F.2d 762, 776 (D.C. Cir. 1987) (en banc) (quotation marks omitted).  The plaintiff's evidence of actual malice, limited to pointing out a facial discrepancy between the BNA summary and the underlying ambiguous source document, was totally insufficient to establish that BNA subjectively had "serious doubts" about the accuracy summary, particularly when evaluated in light of the "clear and convincing" burden of proof.

## ARGUMENT

**I.    THE FIRST AMENDMENT GUARANTEES "BREATHING SPACE" IN ACTUAL MALICE CASES TO PROTECT AGAINST LIABILITY FOR GOOD-FAITH MISTAKES**

The First Amendment to the United States Constitution prohibits the government from "abridging the freedom of speech, or of the press."  U.S. Const. amend. I.  "An action for defamation can be maintained only to the

19

extent it does not interfere with First Amendment rights of free expression."
*Jankovic*, 2016 WL 2640526, at *3.

In an unbroken line of authority starting with the foundational case *New York Times Co. v. Sullivan*, the Supreme Court has held that the First Amendment protection for free speech and a free press requires that public officials or public figures cannot recover in a defamation action unless they can prove by clear and convincing evidence that a defendant published a false statement about them "with 'actual malice,'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."  376 U.S. 254, 279-80 (1964); *see Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155 (1967) (extending actual malice test to public figures).

Actual malice is a <u>subjective</u> standard describing a defendant's state of mind when it has published a false statement with knowledge of falsity or a "high degree of awareness of . . . probable falsity."  *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).  Despite the test's use of the terminology "reckless disregard," the Supreme Court has repeatedly made clear that "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  Instead, "[t]here must be sufficient

20

evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication," but published anyway. *Id.* Accordingly, as this Court recently emphasized: "it is not enough to show that defendant should have known better; instead, the plaintiff must offer evidence that the defendant in fact harbored subjective doubt." *Jankovic*, 2016 WL 2640526, at *8.

Additionally, "[i]n view of the important values enshrined in the First Amendment, the Constitution further protects publishers by requiring that plaintiffs prove actual malice by clear and convincing evidence," *id.*, a heightened burden of proof "which the constitutional standard demands," *New York Times Co.*, 376 U.S. at 285-86.

This Court has observed that actual malice is such a "daunting" standard that "[f]ew public figures have been able to clearly and convincingly" satisfy it. *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996). Indeed, in the leading case *Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) (en banc), this Court explained that to allow a finding of actual malice liability "the publisher must come close to wilfully blinding itself to the falsity of its utterance." *Id.* at 776 (quotation marks omitted).

All of this is by design.  The Supreme Court created the actual malice test specifically to ensure that fear of liability would not chill free speech about public officials and public figures because "erroneous statement is inevitable in free debate" and "it must be protected if the freedoms of expression are to have the breathing space that they need . . . to survive." 376 U.S. at 271-72 (quotation marks omitted; ellipsis in original).  Otherwise, to avoid potential liability for their "inevitable" good-faith errors, publishers would "steer far wider of the unlawful zone," thereby "dampen[ing] the vigor and limit[ing] the variety of public debate."  *Id.*

In the five decades since *New York Times Co. v. Sullivan*, the Supreme Court has repeatedly affirmed the fundamental principle that publishers reporting on public officials and public figures should not be subject to liability for good-faith mistakes.  The Court for instance advised in *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984):  "Realistically, some error is inevitable; and the difficulties of separating fact from fiction convinced the Court in *New York Times* . . . and similar cases to limit liability" under the actual malice standard "in order to eliminate the risk of undue self-censorship and the suppression of truthful material."  *Id.* at 512 (ellipsis and quotation marks omitted); *see also, e.g., St. Amant*, 390 U.S. at

22

732 ("[T]o insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones.").

As long ago as 1966, this Court observed that verification of facts was difficult in an industry where "news quickly goes stale, commentary rapidly becomes irrelevant, and commercial opportunity in the form of advertisements can easily be lost." *Keogh*, 365 F.2d at 972.  Reversing the denial of summary judgment on interlocutory appeal in an actual malice case, this Court cautioned that courts "should be hesitant to impose responsibilities upon newspapers which can be met only through costly procedures or through self-censorship designed to avoid the risks of publishing controversial material." *Id.*

The need to provide "breathing space" for inevitable error remains just as important today as it was fifty years ago, if not more so, given that the dissemination of news and information is now driven by relentless 24-hour demand on television, on the Internet, and in other media.

Accordingly, courts continue to vigorously protect "breathing space" for good-faith reporting on public figures.  *See, e.g.*, *Kipper v. NYP Holdings Co.*, 912 N.E.2d 26, 30 (N.Y. 2009) ("The actual malice standard recognizes

23

that falsehoods relating to public figures are inevitable in free debate and that publishers must have sufficient breathing space so that the First Amendment's commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open will be realized.") (citation and quotation marks omitted); *Jankovic*, 2016 WL 2640526, at *3 ("[The Supreme] Court has been especially anxious to assure to the freedoms of speech and press that 'breathing space' essential to their fruitful exercise.") (quotation marks omitted); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) ("[T]he actual malice standard was designed to allow publishers the 'breathing space' needed to ensure robust reporting on public figures and events.").

Journalism studies and analyses confirm that while reducing errors is always a goal, mistakes will always be made. As one leading study of newspaper errors observed: "A newspaper with a zero level of factual error is a newspaper that is missing deadlines, taking too few risks or both." Scott R. Maier, *Accuracy Matters: A Cross-Market Assessment of Newspaper Error and Credibility*, Journalism & Mass Commc'n Q. 533, 547 (Autumn 2005) (quotation marks omitted), http://tinyurl.com/MediaAmici1.

24

Indeed, mistakes are such an unavoidable part of the journalism landscape that journalism ethics codes and guides focus considerable attention on best practices for addressing them once they have been discovered.  *See, e.g.*, Anthony De Rosa, *A Rule for Online News: Errors Are Inevitable; Lack of Transparency Is Not*, L.A. Times (Aug. 25, 2015), http://tinyurl.com/MediaAmici2; Society of Professional Journalists, *Society of Professional Journalists Code of Ethics* (1996) ("Admit mistakes and correct them promptly."), https://spj.org/pdf/ethicscode.pdf.

It remains critical therefore that the protections of the *New York Times Co. v. Sullivan* actual malice test be vigorously enforced so that publishers of news and information continue to have "breathing space" from liability for "inevitable" good-faith errors.  376 U.S. at 271-72; *Bose Corp.*, 466 U.S. at 512.

## II.    EARLY DISPOSITION OF ACTUAL MALICE CASES HELPS PREVENT UNDUE BURDENS ON THE EXERCISE OF FREE SPEECH

It is not merely the threat of liability that burdens First Amendment rights and therefore chills speech, but also the threat of the expense and distraction of protracted litigation.  That is why one of the most important aspects of the protection afforded by the actual malice test is the

requirement that courts carefully apply it at the summary judgment stage, including its heightened "clear and convincing evidence" burden of proof.

In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court instructed that "[w]hen determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times*." 477 U.S. 242, 254 (1986). Thus, "a court ruling on a motion for summary judgment must be guided by the *New York Times* 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists—that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity." *Id.* at 257; *see McFarlane*, 91 F.3d at 1508.

This Court has thus emphasized that "summary proceedings are essential in the First Amendment area because if a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails." *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (quoting *Keogh*, 365 F.2d at 968).

26

While courts across the country have echoed and amplified this principle,[2] this Court's opinion in *Keogh* is still considered to contain the "classic" statement of it, 2 Hon. Robert D. Sack, *Sack on Defamation: Libel, Slander & Related Problems* § 16.3.1, at 16-36 (4th ed. & supp. 2016):

> In the First Amendment area, summary procedures are even more essential.  For the stake here, if harassment succeeds, is free debate. . . .  The threat of being put to the defense of a lawsuit . . . may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself . . . .

*Keogh*, 365 F.2d at 968.

Because "[t]he costs and efforts required to defend a lawsuit through [preliminary phases] of litigation could chill free speech nearly as effectively as the absence of the actual malice standard altogether," *Michel*, 816 F.3d at

---

[2] *See, e.g.*, *Michel*, 816 F.3d at 702 ("In these cases, there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation. . . .  Forcing publishers to defend inappropriate suits through expensive discovery proceedings in all cases would constrict . . . breathing space in exactly the manner the actual malice standard was intended to prevent."); *Faltas v. State Newspaper,* 928 F. Supp. 637, 640 (D.S.C. 1996) ("Summary judgment is especially appropriate in libel cases, for prolonging a meritless case through trial could result in further chilling of First Amendment rights." (quotation marks omitted)), *aff'd per curiam*, 155 F.3d 557 (4th Cir. 1998); *Durando v. Nutley Sun*, 37 A.3d 449, 460-61 (N.J. 2012); *Chafin v. Gibson*, 578 S.E.2d 361, 367 (W. Va. 2003) (per curiam).

27

702, rigorous application of the actual malice test at summary judgment, with an eye towards resolution of unmeritorious cases like this one, is "essential," *Keogh*, 365 F.2d at 968.

## III.   APPLICATION OF THE ACTUAL MALICE TEST HERE REQUIRES SUMMARY JUDGMENT FOR THE DEFENDANT

The district court's actual malice discussion was limited to two paragraphs, which cited actual malice precedent but did not analyze it. *See* Appellant's App. 334-335.  Instead, the court identified two purported differences between Von Kahl's mandamus petition and the BNA summary,[3] and concluded that "these discrepancies between what the Mandamus Petition actually says and what BNA's 'summary' reports are sufficient to create a genuine dispute of material fact regarding whether BNA acted with reckless disregard with respect to the truth or falsity of the statements in its summary." *Id.*  A thorough analysis and application of actual malice precedent to the facts of this case would, we respectfully suggest, necessarily have resulted in the grant of summary judgment.

---

[3] First, the court noted that language from the BNA summary regarding Von Kahl's purported "lack of contrition" "appear[ed] only in the Appendix to the Petition," and not the petition itself.  Appellant's App. 335.  Second, the petition identified the speaker as the "prosecutor, not the sentencing Judge." *Id.*

28

This is so for at least two reasons.  First, mere evidence that a statement is inaccurate, standing alone, cannot suffice to show that a publisher made the statement with actual malice.  The actual malice test is a subjective one, requiring evidence that a publisher in fact had "serious doubts" as to the falsity of the publication.  *St. Amant*, 390 U.S. at 731.  Where, as here, the only evidence in the record shows that a mistake was caused by a good-faith misreading of source material, the plaintiff cannot show that the defendant subjectively had "serious doubts" as to the accuracy of its publication.

Second, to defeat summary judgment, public figure libel plaintiffs carry an especially heavy burden—they must establish that they can prove actual malice by "clear and convincing evidence." *Tavoulareas*, 817 F.2d at 778.  The record demonstrates decisively that the plaintiff did not and could not carry that burden in this case.

> **A.    Summary Judgment Is Required When the Unrebutted Evidence Shows that Any Mistake Was Made in Good Faith**

Falsity and actual malice are two separate and independently necessary elements of a successful public figure libel claim.  It is well established that "there is a significant difference between proof of actual malice and mere proof of falsity," *Bose*, 466 U.S. at 511, and "[p]roof that a

defendant broadcast false statements will not alone show actual malice," *Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 560 (5th Cir. 1997); *see also* 1 Sack, *supra*, § 5.5.2, at 5-86 ("Falsity alone does not establish 'actual malice.'").

Here, Von Kahl's only evidence of actual malice, and the only evidence cited by the district court, was that the BNA summary and later clarification misidentified the source for the statement that Von Kahl showed no contrition and had told the press that the killings were justified by his religious and philosophical views. *See* Appellant's App. 335. That bare showing of falsity is insufficient on its own. It, moreover, does not answer or undermine the evidence of BNA's good-faith understanding at the time of publication: two unrebutted declarations, by the BNA writer and editor responsible for the summary and clarification, that reasonably explain why the ambiguous transcript excerpt in the appendix to Von Kahl's petition led them to believe that the judge had made the statements. *See* BNA Br. at 8-16 (discussing the petition, and BNA's summary and clarification); *id.* at 32-33 (further explaining the ambiguity of the excerpt); *id.* at 265-68, 283-86 (declarations from the editor and writer). Such good-faith errors fall well within the "breathing space" protected by the First Amendment.

30

The Supreme Court addressed this very issue in *Time, Inc. v. Pape*, 401 U.S. 279 (1971).  In that case, a police officer sued Time Magazine, claiming that its article about a United States Civil Rights Commission report was libelous.  The article included certain brutality claims about the officer that were drawn from a civil complaint cited in the report, but failed to make clear that the statements repeated in the report were mere allegations.  *Id.* at 290.  Noting that the lengthy government report was ambiguous, the Supreme Court concluded that the publisher's rational but mistaken interpretation of it constituted "at most an error of judgment" that did not rise to the level of actual malice.  *Id.* at 292.  Reinstating the trial court's grant of a directed verdict for the defendant, the Court emphasized that the First Amendment ensures "'breathing space'" for "misstatements of this kind." *Id.* (quoting *New York Times Co.*, 376 U.S. at 271-72).

As in *Pape*, courts across the country, including this Court, have ruled as a matter of law that "[a]n honest misinterpretation does not amount to actual malice even if the publisher was negligent in failing to read the document carefully." *Jankovic*, 2016 WL 2640526, at *13; *see also, e.g.*, *Durando*, 37 A.3d at 461; *Freedom Newspapers of Tex. v. Cantu*, 168 S.W.3d 847, 855 (Tex. 2005); *Khan v. New York Times Co.*, 710 N.Y.S.2d 41, 45 (N.Y.

31

App. Div. 2000); *Marcone v. Penthouse Int'l Mag. for Men*, 754 F.2d 1072, 1090 (3d Cir. 1985); 1 Sack, *supra*, § 5.5.2, at 5-95 (discussing cases).

For example, the New York Court of Appeals affirmed the grant of summary judgment to a publisher who was sued for defamation for a story which erroneously reported that a state medical board had revoked the plaintiff physician's license. *See generally Kipper v. NYP Holdings Co.*, 912 N.E.2d 26 (N.Y. 2009). There, as here, the journalists mistakenly interpreted source material. *Id.* at 26. There, as here, the publisher submitted declarations from reporters and editors explaining that they had acted in good faith. *Id.* at 27. There, as here, the plaintiff relied on a comparison against the accurate source material in an attempt to adduce actual malice. *Id.* at 32. The Court of Appeals concluded that the plaintiff's evidence was insufficient to defeat summary judgment:

> Although the actual status of plaintiff's license could be verified through an accurate reading of the [source] article, this potentiality does not negate the possibility that [the reporter] or his editors, all working under a deadline, simply misperceived the correct statement in the [source] article. . . . [A] reasonable jury confronted with these facts and circumstances could not find with convincing clarity that defendant's erroneous statements were published with actual malice. Rather, the record bespeaks nonactionable mistake or negligence.

*Id.* at 32-33 (emphasis added).

Similarly here, BNA's reasonable and unrefuted explanation regarding the cause of its mistake is dispositive; indeed, its declarations are the only evidence of BNA's subjective understanding at the time of publication. Von Kahl and the district court identified no affirmative evidence of actual malice, relying solely on purported "discrepancies" between the article at issue and the ambiguous source material. *See* Appellant's App. 335. That there were factual discrepancies does not remotely show that the BNA journalists had "serious doubts" about them (and indeed, the unrebutted declarations prove that they did not, and acted in good faith). *See Pape*, 401 U.S. at 292; *Jankovic*, 2016 WL 2640526, at *16; *Kipper*, 912 N.E.2d at 33.

## B. Summary Judgment Is Required When a Plaintiff Cannot Prove by "Clear and Convincing Evidence" that a Defendant Made a False Statement with Actual Malice

Even if there were some plausible argument that the defendant in this case acted with actual malice—and none has been advanced—that would not be enough to prove actual malice by the "clear and convincing" proof that the Constitution demands.

"[A] court ruling on a motion for summary judgment must be guided by the *New York Times* 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists." *Anderson*, 477

33

U.S. at 257.  The plaintiff must offer "affirmative evidence" to satisfy this "clear and convincing" threshold.  *Id.*  Thus, "the burden of proof imposed on public figures is significantly more onerous than the usual preponderance of the evidence standard," *Tavoulareas*, 817 F.2d at 776, and it "is not easily met, even at summary judgment."  *Jankovic*, 2016 WL 2640526, at *9.

In *Tavoulareas*, this Court sitting en banc underscored the importance of the "clear and convincing" burden of proof.  The Court explained that the requirement "administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander."  817 F.2d at 776 (quotation marks omitted).  It also "exacts a correspondingly high price from the victims of defamatory falsehood" such that "many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974).[4]

---

[4] Indeed, the *Tavoulareas* court, 817 F.2d at 776, cited a case in which a court set aside a jury verdict on "clear and convincing" grounds while noting that the verdict would have stood under the ordinary preponderance standard.  *See Long v. Arcell*, 618 F.2d 1145, 1148 (5th Cir. 1980), *cert. denied*, 449 U.S. 1083 (1981); *see also McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996) ("Few public figures have been able clearly and convincingly to prove that the scurrilous things said about them were

In this case, the plaintiff's threadbare evidence of actual malice should fail under even a simple preponderance standard, because evidence of a good-faith mistake cannot establish actual malice under any standard. *See supra* Part III(A). But in any case, the evidence here could not by any stretch of the imagination qualify as clear and convincing. As the *Kipper* court concluded in words that apply here: "[A] reasonable jury confronted with these facts and circumstances could not find with convincing clarity that defendant's erroneous statements were published with actual malice." 912 N.E.2d at 33; *see also Jankovic*, 2016 WL 2640526, at *16; *Lohrenz v. Donnelly*, 350 F.3d 1272, 1284 (D.C. Cir. 2003).

## CONCLUSION

For the reasons stated above, the district court's summary judgment ruling on actual malice should be reversed.

Dated: May 18, 2016                    Respectfully submitted,

/s/ Kevin T. Baine
Kevin T. Baine
Thomas G. Hentoff
Nicholas G. Gamse (*admission pending*)
 Williams & Connolly LLP
 725 Twelfth Street, N.W.
 Washington, DC 20005

---

published by someone with 'serious doubts as to the truth of his publication.'") (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

35

(202) 434-5000
thentoff@wc.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENT, <u>AND TYPE STYLE REQUIREMENTS</u>

I hereby certify that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Century Expanded BT 14-point font.

Dated: May 18, 2016

<u>/s/ Kevin T. Baine</u>
Kevin T. Baine

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be filed electronically the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on May 18, 2016.

I further certify that on May 18, 2016, I served the foregoing by United States first-class mail, postage prepaid upon the following:

Yorie Von Kahl
Federal Prisoner: 04565-059
United States Penitentiary
McCreary
PO Box 3000
Pine Knot, KY 42635

Dated: May 18, 2016

/s/ Kevin T. Baine
Kevin T. Baine