# Nos. 16-7033 and 16-7034

———————————————

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

**THE BUREAU OF NATIONAL AFFAIRS, INC.,**

*Defendant-Appellant / Cross-Appellee,*

v.

**YORIE VON KAHL,**

*Plaintiff-Appellee / Cross-Appellant.*

———————————————

From an Order by the U.S. District Court for the District of Columbia
The Honorable Ketanji Brown Jackson, Judge Presiding
(Case No. 1:09-cv-00635 (KBJ))

---

## DEFENDANT-APPELLANT/ CROSS-APPELLEE THE BUREAU OF NATIONAL AFFAIRS, INC.'S CORRECTED OPENING BRIEF

---

| | |
|---|---|
| LEVINE SULLIVAN KOCH<br>  & SCHULZ, LLP<br>Jay Ward Brown (Bar No. 437686)<br>1899 L Street, NW<br>Suite 200<br>Washington, DC  20036-5514<br>Telephone: (202) 508-1100<br>Facsimile: (202) 861-9888<br>jbrown@lskslaw.com | DAVIS WRIGHT TREMAINE LLP<br>Laura R. Handman (Bar No. 444386)<br>Lisa B. Zycherman (Bar No. 495277)<br>1919 Pennsylvania Avenue, NW<br>Suite 800<br>Washington, DC  20006<br>Telephone: (202) 973-4200<br>Facsimile: (202) 973-4499<br>laurahandman@dwt.com<br>lisazycherman@dwt.com |

*Attorneys for Defendant-Appellant / Cross-Appellee*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

The sole Plaintiff below and Cross-Appellant here is Yorie Von Kahl ("Von Kahl").  The sole Defendant below and Appellant and Cross-Appellee here is The Bureau of National Affairs, Inc. ("BNA").  BNA is 100% owned by Bloomberg-BNA Holdings, Inc., which in turn is 100% owned by Bloomberg Inc.  None of these three entities is publicly held.

There were no amici in the district court.  Amicus counsel appointed by this Court in support of Von Kahl is Gregory J. Dubinsky of Boies, Schiller & Flexner LLP.  Leave to file an amici brief on behalf of 27 media organizations in support of BNA will be sought by Kevin Baine and Thomas G. Hentoff of Williams & Connolly LLP.

### B.    Rulings

BNA appeals from the district court's opinion and order on the parties' cross-motions for summary judgment.  Appellant's App. 317 (ECF No. 87, Mem. Op. & Order) ("Summary Judgment Order").  The district court subsequently granted BNA's request to certify the summary judgment decision for interlocutory review, pursuant to 28 U.S.C. § 1292(b), on the grounds that there is a "difference of opinion" as to whether plaintiff, who alleges defamation, met his burden on summary judgment of demonstrating that a reasonable jury could find, by clear and convincing evidence, that BNA acted with actual malice.  Appellant's App. 339

i

(ECF No. 114, Mem. Op. & Order) ("Certification Order").  This appeal also concerns the district court's predicate decision that the plaintiff is a limited purpose public figure, an issue raised in Von Kahl's Cross-Petition for Appeal ("Cross-Petition").  *See* Appellant's App. 134 (ECF No. 53, Mem. Op. & Order).

## C.    Related Cases

On August 31, 2015, BNA petitioned this Court to grant interlocutory review, under 28 U.S.C. § 1292(b) ("Petition to Appeal").  That petition was assigned Docket No. 15-8007.  Von Kahl thereafter cross-petitioned the Court for interlocutory review under the same docket number.  On March 14, 2016, this Court granted BNA's Petition to Appeal and Von Kahl's Cross-Petition and directed the parties to address, *inter alia*, which issues in the Cross-Petition may be properly considered on appeal.  *See* Appellant's App. 345 (No. 15-8007, Doc. No. 1603908).  The Court subsequently consolidated BNA's appeal, No. 16-7033, and Von Kahl's cross-appeal, No. 16-7034.

Dated: May 19, 2016                      */s/ Laura R. Handman*
                                         Laura R. Handman

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

    A.    Parties and Amici .................................................................. i

    B.    Rulings................................................................................... i

    C.    Related Cases ........................................................................ ii

GLOSSARY...................................................................................... xii

JURISDICTIONAL STATEMENT .....................................................1

STATEMENT OF ISSUES .................................................................1

PRELIMINARY STATEMENT .........................................................2

STATEMENT OF THE CASE ............................................................5

    A.    Von Kahl's Conviction and Sentencing.................................5

    B.    Media Attention, Commentary, and Von Kahl's Self-Promotion .......6

    C.    Von Kahl's Post-Conviction Litigation .................................8

    D.    The Summary .......................................................................12

    E.    The Clarification & Complaint .............................................14

    F.    Prior Proceedings .................................................................16

    G.    The District Court's Order Denying Summary Judgment .................17

    H.    Certification of Interlocutory Appeal....................................19

SUMMARY OF THE ARGUMENT ....................................................20

ARGUMENT ....................................................................................24

    A.    Standard of Review ..............................................................24

    B.    The District Court Incorrectly Determined That Von Kahl Had Met His Burden of Coming Forward With Clear and Convincing Evidence of Actual Malice ...........................25

1.  Courts Uniformly Find No Actual Malice For Mistakes Resulting From A Simple Misreading Of A Document ...........27

2.  The Record As A Whole Negates A Finding of Actual Malice.................................................................................34

C.  The District Court Correctly Determined That Von Kahl Was A Limited Purpose Public Figure...........................................43

1.  Scope of Review ........................................................43

2.  Von Kahl Is A Limited Purpose Public Figure........................45

a.  The Public Controversy .................................................46

b.  Von Kahl's Voluntary Participation in the Public Controversy.................................................................49

c.  The Challenged Statement Is Germane to Von Kahl's Participation in the Controversy .........................51

CONCLUSION ....................................................................53

CERTIFICATE OF COMPLIANCE.......................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Wisconsin Airlines Corp. v. Hoeper*,
   134 S. Ct. 852 (2014)....................................................................33

*Alade v. Borg-Warner Protective Servs. Corp.*,
   28 F. Supp. 2d 655 (D.D.C. 1998)...............................................26

*\*Anderson v. Liberty Lobby*,
   477 U.S. 242 (1986)...................................................2, 20, 24, 25

*Armstrong v. Bush*,
   924 F.2d 282 (D.C. Cir. 1991)......................................................43

*Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*,
   383 F. Supp. 2d 32 (D.D.C. 2005)................................................26

*Berry v. Nat'l Broad. Co.*,
   480 F.2d 428 (8th Cir. 1973) .......................................................51

*Bose Corp. v. Consumers Union*,
   466 U.S. 485 (1984)........................................................24, 25, 28

*Buendorf v. National Pub. Radio, Inc.*,
   822 F. Supp. 6 (D.D.C. 1993).................................................26, 29

*Caudle v. Thomason*,
   992 F. Supp. 1 (D.D.C. 1997).......................................................26

*Clyburn v. News World Commc'ns, Inc.*,
   705 F. Supp. 635 (D.D.C. 1989), *aff'd*, 903 F.2d 29
   (D.C. Cir. 1990) ....................................................................26, 50

*Dameron v. Washington Mag., Inc.*,
   779 F.2d 736 (D.C. Cir. 1985).......................................................49

*Dostert v. Washington Post Co.*,
   531 F. Supp. 165 (N.D. W.Va. 1982)............................................32

*Dunn v. Gannett N.Y. Newspapers, Inc.*,
   833 F.2d 446 (3d Cir. 1987) .........................................................29

*Ellis v. Time, Inc.*,
　　1997 WL 863267 (D.D.C. Nov. 18, 1997) ......................................................26, 34

*Farah v. Esquire Magazine*,
　　736 F.3d 528 (D.C. Cir. 2013) ...................................................................................4

*Farrakhan v. NYP Holdings*,
　　638 N.Y.S.2d 1002 (N.Y. Sup. Ct. 1995), *aff'd*, 656 N.Y.S.2d 726
　　(N.Y. App. Div. 1st Dep't 1997), *leave to appeal denied*,
　　691 N.E.2d 803 (N.Y. 1997) ....................................................................................31

*Foretich v. American Broad. Cos.*,
　　1997 WL 669644 (D.D.C. Oct. 17, 1997) ...............................................................26

*Foretich v. Capital Cities/ABC, Inc.*,
　　37 F.3d 1541 (4th Cir. 1994) ...................................................................................47

*Forman v. Small*,
　　271 F.3d 285 (D.C. Cir. 2001)..................................................................................24

*Garrison v. Louisiana*,
　　379 U.S. 64 (1964)....................................................................................................21

*Gertz v. Robert Welch, Inc.*,
　　418 U.S. 323 (1974).............................................................................................45, 46

*Glover v. Herald Co.*,
　　549 S.W.2d 858 (Mo. 1997) .....................................................................................31

*Gray v. St. Martin's Press, Inc.*,
　　221 F.3d 243 (1st Cir. 2000).....................................................................................37

*Harris v. Quadracci*,
　　856 F. Supp. 513 (E.D. Wis. 1994), *aff'd*, 48 F.3d 247
　　(7th Cir. 1995)...........................................................................................................52

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
　　491 U.S. 657 (1989).................................................................................24, 38, 40, 41

*Hatfill v. N.Y. Times Co.*,
　　532 F.3d 312 (4th Cir. 2008) ...................................................................................50

*Hobbs v. Pasdar*,
  682 F. Supp. 2d 909 (E.D. Ark. 2009)............................................51, 52

*Hoffman v. Washington Post Co.*,
  433 F. Supp. 600 (D.D.C. 1977), *aff'd without opinion*,
  578 F.2d 442 (D.C. Cir. 1978)....................................................43

*Jankovic v. International Crisis Grp.*,
  72 F. Supp. 3d 284 (D.D.C. 2014), appeal docketed,
  No. 14-7178 (D.C. Cir. argued Feb. 10, 2016)..................26, 34, 38, 48

*Jenkins v. Liberty Newspapers Ltd. P'ship*,
  971 P.2d 1089 (Haw. 1999)........................................................31

*Joseph v. Xerox Corp.*,
  594 F. Supp. 330 (D.D.C. 1984)...................................................26

*In re Kahl*,
  534 U.S. 948 (2001)................................................................8

*In re Kahl*,
  546 U.S. 809 (2005)................................................................9

*In re Kahl*,
  552 U.S. 988 (2007), *reh'g denied*, 552 U.S. 1159 (2008) .................9

*In re Kahl*,
  No. 04-1717 (U.S. June 17, 2005) ...............................................6

*Kipper v. NYP Holdings Co.*,
  912 N.E.2d 26 (N.Y. 2009)........................................................30

*Klayman v. Judicial Watch, Inc.*,
  628 F. Supp. 2d 112 (D.D.C. 2009)..............................................26

*Lane v. Random House, Inc.*,
  985 F. Supp. 141 (D.D.C. 1995)..................................................26

*LaPointe v. Van Note*,
  2006 WL 3734166 (D.D.C. Dec. 15, 2006) ...................................26

*Liberty Lobby, Inc. v. Anderson*,
  No. 81-2240, 1991 WL 186998 (D.D.C. May 1, 1991) ....................31

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
838 F.2d 1287 (D.C. Cir. 1988)................................................................26

*Liberty Lobby, Inc. v. Rees*,
852 F.2d 595 (D.C. Cir. 1988)................................................................26

*Lluberes v. Uncommon Prods., LLC*,
663 F.3d 6 (1st Cir. 2011)......................................................................49

*Logan v. District of Columbia*,
447 F. Supp. 1328 (D.D.C. 1978)......................................................43, 52

*Lohrenz v. Donnelly*,
350 F.3d 1272 (D.C. Cir. 2003)......................................... 22, 25, 26, 39-41, 50

*Mar-Jac Poultry, Inc. v. Katz*,
773 F. Supp. 2d 103 (D.D.C. 2011)........................................................26

*Marcone v. Penthouse Int'l Mag. for Men*,
754 F.2d 1072 (3d Cir. 1985).................................................................29

*Martin v. N.Y. Daily News*,
951 N.Y.S.2d 87 (N.Y. Sup. Ct. 2012), *aff'd*, 990 N.Y.S.2d 473
(N.Y. App. Div. 1st Dep't 2014), *leave to appeal denied*, 21
N.E.3d 569 (N.Y. 2014).......................................................................30

*McBride v. Merrell Dow & Pharms., Inc.*,
613 F. Supp. 1349 (D.D.C. 1985), *aff'd in relevant part*, 800 F.2d
1208 (D.C. Cir. 1986) ..........................................................................26

*McFarlane v. Esquire Magazine*,
74 F.3d 1296 (D.C. Cir. 1996)................................................................4

*McFarlane v. Sheridan Square Press*,
91 F.3d 1501 (D.C. Cir. 1996)......................................... 4, 26, 38, 41-43

*Moldea v. N.Y. Times Co.*,
22 F.3d 310 (D.C. Cir. 1994)............................................................26, 27, 29

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)......................................... 3, 4, 21, 25, 37, 43, 45

*OAO Alfa Bank v. Center for Pub. Integrity*,
    387 F. Supp. 2d 20 (D.D.C. 2005).........................................................26, 46, 48

*Orr v. Argus-Press Co.*,
    586 F.2d 1108 (6th Cir. 1978) .......................................................................29

*Parsi v. Daioleslam*,
    890 F. Supp. 2d 77 (D.D.C. 2012)...........................................................26, 34

*In re Peltier*,
    No. 04-5391, 2004 WL 3019530 (D.C. Cir. Dec. 30, 2004)
    (per curiam), *cert. denied*, 534 U.S. 941 (2001)........................................9

*Piracci v. Hearst Corp.*,
    263 F. Supp. 511 (D. Md. 1966), *aff'd*, 371 F.2d 1016
    (4th Cir. 1967)..............................................................................................32

*Price v. Chicago Mag.*,
    1988 WL 61170 (N.D. Ill. June 1, 1988)......................................................52

*Q Int'l Courier, Inc. v. Seagraves*,
    1999 WL 1027034 (D.D.C. Feb. 26, 1999)...................................................26

*Read v. Phoenix Newspapers, Inc.*,
    819 P.2d 939 (Ariz. 1991) ............................................................................32

*Rosanova v. Playboy Enters., Inc.*,
    580 F.2d 859 (5th Cir. 1978) ........................................................................52

*Ruf v. American Broad. Cos.*,
    2000 WL 35433488 (D.D.C. Feb. 22, 2000).................................................26

*Sculimbrene v. Reno*,
    158 F. Supp. 2d 8 (D.D.C. 2001)..................................................................26

*Secord v. Cockburn*,
    747 F. Supp. 779 (D.D.C. 1990)...................................................................26

*Simmons Ford, Inc. v. Consumers Union*,
    516 F. Supp. 742 (S.D.N.Y. 1981) ...............................................................30

*Simonson v. United Press Int'l, Inc.*,
    654 F.2d 478 (7th Cir. 1981) ........................................................................31

ix

*St. Amant v. Thompson,*
    390 U.S. 727 (1968)................................................ 21, 22, 34, 35, 37, 40

*Stark v. Zeta Phi Beta Sorority, Inc.,*
    587 F. Supp. 2d 170 (D.D.C. 2008)....................................................26

*Tao v. Freeh,*
    27 F.3d 635 (D.C. Cir. 1994)...........................................................24

*Tavoulareas v. Piro,*
    817 F.2d 762 (D.C. Cir. 1987)....................................... 4, 26, 38, 42, 45, 48, 51

*Time, Inc. v. Pape,*
    401 U.S. 279 (1971)....................................................3, 22, 27, 28, 33

*Torgerson v. Journal/Sentinel, Inc.,*
    563 N.W.2d 472 (Wis. 1997)............................................................31

*United States v. Faul,*
    748 F.2d 1204 (8th Cir. 1984) ........................................................5, 8

*United States v. Kahl,*
    No. A3-96-55, 2003 WL 21715352 (D.N.D. July 14, 2003),
    *aff'd,* 95 F. App'x 200 (8th Cir. 2004) .............................................5, 8

*United States v. Philip Morris USA, Inc.,*
    396 F.3d 1190 (D.C. Cir. 2005)........................................................44

*Vazquez Rivera v. El Dia, Inc.,*
    641 F. Supp. 668 (D.P.R. 1986) ......................................................30

*Von Kahl v. United States,*
    242 F.3d 783 (8th Cir. 2001), *cert. denied,* 534 U.S. 941 (2001) .......................8

*Von Kahl v. United States,*
    321 F. App'x 724 (10th Cir. 2009) ...................................................9

*Waldbaum v. Fairchild Publications, Inc.,*
    627 F.2d 1287 (D.C. Cir. 1980)............................................... 46-50, 53

*Washington Post Co. v. Keogh,*
    365 F. 2d 965 (D.C. Cir. 1966)..............................................4, 21, 22, 26, 37, 38

*White v. Fraternal Order of Police*,
909 F.2d 512 (D.C. Cir. 1990)...............................................................26

*Yamaha Motor Corp.*, *U.S.A. v. Calhoun*,
516 U.S. 199 (1996).................................................................20, 43, 44

**Statutes**

18 U.S.C. § 2...........................................................................................14, 16

18 U.S.C. § 111...........................................................................................14

18 U.S.C. § 111[1]........................................................................................14

18 U.S.C. § 371...........................................................................................14

18 U.S.C. § 1071.........................................................................................14

18 U.S.C. § 1111...............................................................................5, 9, 14, 16

18 U.S.C. § 1114...............................................................................5, 9, 14, 16

28 U.S.C. § 1292(b) ...........................................................................1, 19, 44

28 U.S.C. § 1332(a)(2)....................................................................................1

**Rules**

Fed. R. Civ. P. 56(c).....................................................................................24

**Constitutional Provisions**

U.S. Const., amend. I ....................................... 2-5, 20-21, 23-24, 27, 46

**Other Authorities**

1 Hon. Robert D. Sack, *Sack on Defamation*, § 5:5.2 at 5-90 to 5-95
(4th ed. 2010) ..........................................................................................40

1 Hon. Robert D. Sack, *Sack on Defamation*, § 5:5.2[B] at 5-94 - 5-95
(4th ed. 2010) ..........................................................................................31

*Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY

Appellant's App.    Appellant's Appendix

BNA    The Bureau of National Affairs, Inc.

CLR    *Criminal Law Reporter*

## JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction over the claims in this case pursuant to 28 U.S.C. § 1332(a)(2) in that this is a civil action between citizens of different states in which the amount in controversy exceeds $75,000.  This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1292(b) and the Court's Order granting BNA's Petition to Appeal and Von Kahl's Cross-Petition.  The district court entered notices of appeal for each litigant on March 14, 2016.

## STATEMENT OF ISSUES

1.      Whether the district court erred in denying BNA's motion for summary judgment where Plaintiff, who relied solely on the fact that BNA had misattributed a statement contained in the appendix of a mandamus petition, failed to present clear and convincing evidence that could support a reasonable jury finding either that BNA knew that its statement was false or that BNA in fact entertained serious doubts as to the truth of its publication.

2.      Whether Plaintiff properly seeks interlocutory review of the district court's ruling that he is a limited purpose public figure, since that issue is part of the application of the actual malice standard in this action, and whether Plaintiff – who was convicted of killing two U.S. Marshals – was properly deemed a limited purpose public figure.

## PRELIMINARY STATEMENT

Von Kahl, a man convicted of killing two U.S. Marshals and currently serving two life sentences plus fifteen years in federal prison, brought a defamation claim arising from BNA's publication in its *Criminal Law Reporter* of a summary of Von Kahl's 2005 Petition for Writ of Mandamus filed in the U.S. Supreme Court.  BNA sought summary judgment on several grounds, including that Von Kahl, a limited purpose public figure, had not met the high burden of coming forward with "concrete," "affirmative evidence" that would allow a reasonable jury to find, with "convincing clarity," that BNA acted with actual malice because it either knew what it published was false or entertained serious doubts as to the truth.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 256, 257 (1986).  The district court denied BNA summary judgment, concluding that because BNA's description of plaintiff's mandamus petition misattributed to the judge a statement in fact made by the prosecutor, such "discrepancies," standing alone, are "sufficient to create a genuine dispute of material fact regarding whether BNA acted with reckless disregard with respect to the truth or falsity of the statements in its summary." Appellant's App. 335 (Summary Judgment Order 19).

In this interlocutory appeal, BNA seeks reversal of the district court's actual malice ruling, which was contrary to long-standing First Amendment precedent holding that mistakes that result from simply misreading a court document cannot

2

– without more – constitute actual malice.  While journalists always strives for accuracy, the actual malice standard gives "the freedoms of expression" the necessary "'breathing space' that they 'need … to survive,'" recognizing the reality that "erroneous statement is inevitable."  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271-72 (1964) (citation omitted).

Reversal of the district court's denial of summary judgment is necessary to preserve this vital "zone of protection" for "errors of fact caused by negligence" and "errors of interpretation," even when those errors may suggest to the reader that the publication was relying upon a "more authoritative source" than the actual one.  *Time, Inc. v. Pape*, 401 U.S. 279, 290-91 (1971) (reversing appellate court's reversal of summary judgment).  In *Pape*, there was a deliberate omission of the word "alleged" that made what was only an allegation instead appear to be a finding by a government commission – which the Supreme Court viewed as the result of a "rational interpretation" of a governmental report.  Here, there was at most a negligent mistake in interpreting a court record to suggest that it was the judge, rather than the prosecutor, who said that Von Kahl lacked contrition.  Given that the deliberate omission of the word "alleged" in *Pape* did not rise to the level of actual malice, the mistake made here surely did not.

Reflecting a "national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," the First Amendment creates

3

a high bar for public figures to succeed on a defamation claim. *N.Y. Times Co.*,

376 U.S. at 270. The "standard of actual malice is a daunting one," *McFarlane v.*

*Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996), and "[f]ew public figures

have been able clearly and convincingly to prove that the scurrilous things said

about them were published by someone with 'serious doubts as to the truth of [the]

publication.'" *McFarlane v. Sheridan Square Press*, 91 F.3d 1501, 1515 (D.C.

Cir. 1996) (citation omitted). In this Circuit, summary judgment has long been the

rule, not the exception, in actual malice cases. *See infra* at 26 (collecting cases).

Courts nationwide, from the Supreme Court on down, have uniformly dismissed

libel suits where actual malice is based solely on misinterpretation of source

material. *See infra* at 27-31 (collecting cases). The fact that Von Kahl's claim

would apparently be the first defamation trial against a media defendant in this

Circuit since the 1980s – here, based solely on the misattribution of a quotation – is

striking.[1] "[I]f a [libel] suit entails 'long and expensive litigation,' then the

protective purpose of the First Amendment is thwarted even if the defendant

ultimately prevails." *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir.

2013) (quoting *Washington Post Co. v. Keogh*, 365 F. 2d 965, 968 (D.C. Cir.

---

[1] The most recent court decision we have found in this Circuit referring to a defamation trial against the media is *Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) (*en banc*) (affirming judgment notwithstanding the verdict to media defendants following defamation jury trial because plaintiff failed to establish clear and convincing proof of constitutional actual malice).

1966)).  Accordingly, the district court's order should be reversed and summary judgment entered to prevent the sort of substantial chilling effect that the First Amendment seeks to prevent.

## STATEMENT OF THE CASE

### A.    Von Kahl's Conviction and Sentencing

In 1983, Yorie Von Kahl was convicted of second degree murder in connection with the highly publicized shooting deaths of two U.S. Marshals.  The incident took place in North Dakota when Von Kahl was with his father, for whom an arrest warrant was outstanding for violation of probation arising out of the latter's 1977 conviction on two counts of failing to file income tax returns.  When United States Marshals attempted to arrest Von Kahl's father, a shoot-out erupted resulting in the deaths of two marshals and injuries to three other law enforcement officers, as well as to Von Kahl.

Von Kahl was indicted under 18 U.S.C. §§ 1111 and 1114 on each of two counts for first degree murder and killing a United States Marshal in the line of duty, and on other counts for assaulting United States Marshals and other law enforcement officers, conspiracy to assault, and harboring and concealing a fugitive.  A jury acquitted Von Kahl of both counts of first degree murder, but convicted him of the lesser included offense of second degree murder and of other offenses.  *See United States v. Faul*, 748 F.2d 1204 (8th Cir. 1984); *United States*

*v. Kahl*, No. A3-96-55, 2003 WL 21715352, at *1 (D.N.D. July 14, 2003), *aff'd*, 95 F. App'x 200 (8th Cir. 2004); Appellant's App. 178-179 (Von Kahl Pet. Writ Mandamus, *In re Kahl*, No. 04-1717 (U.S. June 17, 2005)), at 3-4).

At the sentencing hearing, Chief Judge Paul Benson identified as "aggravating factors" that Von Kahl showed "no concern for the victims, no concern apparently shown or felt for the victims, for the families of the victims and even more difficult to understand no concern for the families, for their own families…. Yorie Kahl was seeking to protect his father but protecting him from what? From an arrest for a minor violation and for that Yorie Kahl was willing to kill?" Appellant's App. 242-43 (Sentencing Tr. 29:19-30:5). The court imposed a total sentence of two life terms plus fifteen years. Von Kahl is currently serving his sentence at a maximum security prison in Pine Knot, Kentucky.

### B.     Media Attention, Commentary, and Von Kahl's Self-Promotion

The shoot-out, the death of two U.S. Marshals, and Von Kahl's murder convictions were the subject of substantial local and national media attention. The press extensively covered Von Kahl's indictment, trial, conviction, and appeal. *See* Appellant's App. 59-102. In 1991, NBC broadcast a television movie about the shoot-out titled "In the Line of Duty: Manhunt in the Dakotas."[2] And several books have been published about plaintiff's father's life as a tax protestor, and

---

[2] *See* Appellant's App. 53 (Joan Hanauer, UNITED PRESS INTERNATIONAL, May 10, 1991).

recount the shoot-out and Von Kahl's convictions for the murders of federal marshals.[3]  The shoot-out also inspired the making of a documentary film, *Death & Taxes*, released in 1993, for which Von Kahl gave extensive interviews.[4]  The documentary includes a recording of Von Kahl describing the shoot-out, and stating that the marshals "needed to be shot"; that if he had it to do over, he "would have done the same thing I did"; and that the incident "stemmed from our political and religious ideology."  Appellant's App. 160 (Def.'s Statement of Undisputed Material Facts "SUMF" ¶ 14).

Von Kahl's trial, and the eventual death of his father in a shoot-out while hiding as a fugitive in Arkansas, sparked media attention for a group known as the "Posse Comitatus," an extremist anti-tax group also known for espousing racist and anti-Semitic views, condemning government officials, and preaching violence.[5]  Von Kahl has promoted his involvement in the shoot-out by publishing several books or pamphlets discussing his criminal case and his protest thereof, which writings are currently available for purchase on Amazon.  Appellant's App.

---

[3] *See*, *e.g.*, Appellant's App. 56 (Wayne King, *Books of the Times; A Farmer's Fatal* Obsession *With Jews and Taxes*, N.Y. TIMES, Aug. 21, 1990 (reviewing James Corcoran, *Bitter Harvest* (Viking) (1990)).

[4] *See* Appellant's App. 103 (http://www.amazon.com/Death-Taxes-VHS-Lynn-Crooks/dp/6303927912/ref=sr_1_fkmr0_1?ie=UTF8&qid=1461185419&sr=8-1-fkmr0&keywords=Death+%26+Taxes+von+kahl (last visited May 11, 2016)).

[5] *See* Appellant's App. 60 (The Posse Comitatus: What Is It?, U.S. News & World Report, Aug. 8, 1983).

126-132.  In a work titled "Yorie Von Kahl, the son of martyred hero Gordon

Kahl, writes the most damning indictment ever written to the jew-rented prostitutes

called Senators … of the U.S.S.A (Aryan Nations Newsletter)," published in 1989,

Von Kahl continued to associate himself with the Posse and their anti-government

beliefs.  With the work "A Writ of Habeas Corpus: Documenting the Cause of the

Federal Assault on Gordon Kahl at Medina, ND," published in 2004, a year before

the BNA publication at issue, Von Kahl continued to publicize the shoot-out and

inject his narrative into the stream of commentary that has been published about

the incident.  And, for at least some time, Von Kahl or his supporters maintained a

website devoted to his criminal case, www.yorievonkahl.com, as reported in

February 2006 by The Idaho Observer.  Appellant's App. 107-108; *see also*

Appellant's App. 160 (Def.'s SUMF ¶ 14).  Indeed, Google searches yield scores

of articles, propaganda, and commentary from Von Kahl, his supporters, and his

opponents that plainly illustrate his public statements and the public's reactions to

the shoot-out, his convictions, and his beliefs.  *See*, *e.g.*, Appellant's App. 107-124.

### C.    Von Kahl's Post-Conviction Litigation

Von Kahl has lodged numerous unsuccessful appeals to overturn his

conviction and sentence.[6]  Of particular relevance here, on July 17, 2005, Von

---

[6] *See, e.g.*, *United States v. Faul*, 748 F.2d 1204 (8th Cir. 1984), *cert. denied*, 472 U.S. 1027 (1985); *Von Kahl v. United States*, 242 F.3d 783 (8th Cir. 2001), *cert. denied*, 534 U.S. 941 (2001); *In re Kahl*, 534 U.S. 948 (2001); *United States*

Kahl, represented by counsel, filed his second petition for a writ of mandamus with the U.S. Supreme Court ("Petition"), which challenged the sentencing court's jurisdiction as well as the application of 18 U.S.C. §§ 1111 and 1114. *Id.* at 1-2. The Petition was denied. *In re Kahl*, 546 U.S. 809 (2005). The one-paragraph summary of the Petition in BNA's *Criminal Law Reporter* (the "Summary") led to the present libel action.

Von Kahl's Petition consisted of various required sections, including an "Appendix," wherein the petitioner is supposed to reproduce relevant portions of the lower court's record. Appellant's App. 171. Von Kahl's Appendix included excerpts from the "Transcript of Proceedings" at his June 1983 sentencing hearing, stating, below the caption: "BEFORE: CHIEF JUDGE PAUL BENSON." *Id.* at 209. Other than that reference, it omitted any identification of the speakers.

The sentencing transcript excerpts contained in the Petitioner's Appendix include statements regarding Von Kahl's lack of contrition and that he justified the killings on a religious philosophical belief. The relevant transcript excerpt in the Appendix that accompanied the Petition appeared immediately after the judge's name, ellipses and a line of text and ellipses:

---

*v. Kahl*, No. A3-96-55, 2003 WL 21715352 (D.N.D. July 14, 2003), *aff'd*, 95 F. App'x 200 (8th Cir. 2004); *In re Peltier*, No. 04-5391, 2004 WL 3019530 (D.C. Cir. Dec. 30, 2004) (per curiam), *cert. denied*, 534 U.S. 941 (2001); *In re Kahl*, 552 U.S. 988 (2007), *reh'g denied*, 552 U.S. 1159 (2008); *Von Kahl v. United States*, 321 F. App'x 724 (10th Cir. 2009).

9

> With regard to Yorie Van Kahl there is not even a hint of contrition. The man refused to even talk to the probation officer. We have the statements at trial and those issued to the press and whatnot that this man basically believes that these murders, cold blooded calculated murders were justified by some sort of a perverted religious philosophical belief which perhaps wasn't even his perhaps it was simply that of his father's. This country is not safe for Yorie Von Kahl.

Appellant's App. 209-210 (Von Kahl Pet. App. 33-35). The Appendix also contains, starting on the same page, following additional ellipses, and no identification of a different speaker, the pronouncement of the sentences imposed on Von Kahl and the other defendants. *Id.* at 210-211 (Von Kahl Pet. App. 34-36). The relevant excerpts of the transcript appeared in the Appendix thus:

10

App. 32

restoration of the family to a position of prominence in society to justify and rationalize the use of armed violence to resist and intimidate legitimate authority. The amount of fire power, the manner in which they dispersed when stopped, the total lethality of their actions demonstrated conclusively not only training and preparation but a recognition by the defendants that they would some day have a confrontation with law enforcement or other governmental authorities.

---

App. 33

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

                       CRIMINAL NO.
vs                     C3 83-16

SCOTT FAUL, YORIE VON KAHL,
DAVID RONALD BROER, aka
David Ronald Brewer
and JOAN KAHL,

    Defendants.

TRANSCRIPT

of

PROCEEDINGS

June 24, 1983

1:30 o'clock P.M.

(Sentencing)

U.S. District Courthouse
Old Federal Building
Fargo, North Dakota

BEFORE:   CHIEF JUDGE PAUL BENSON

\*     \*     \*

[24] sentence for each of these Defendants.

With regard to Yorie Von Kahl there is not even a hint of contrition. The man refused to even talk to the probation officer. We have the statements at trial and those issued to the press and whatnot that this man honestly believes that these murders, cold blooded calculated

---

App. 34

murders were justified by some sort of a perverted religious philosophical belief which perhaps wasn't even his perhaps it was simply that of his father's. This country is not safe for Yorie Von Kahl.

Scott Faul, while there has been some indication of contrition on his part, I think it's fair to say that the contrition really constitutes being simply sorry that it happened, not sorry that he did it. He again admits no guilt, justifies his comments by rationalized self serving delusions that he was being pursued on some sort of a school delinquency charge. His story didn't make sense when it was told to the jury, still doesn't make sense as told to the probation officer. He knew what was happening that day. He knew there was an attempt to allude arrest of Gordon Kahl and he knew why they wanted Gordon Kahl. He didn't start the shooting, Yorie Kahl did, but he joined in within seconds of the first shot being fired. He joined in willingly. He fired deadly volleys. His intent is certainly not seriously disputed. It certainly was not a serious dispute to this

\*     \*     \*

[32] each of Counts 5, 6, 7 and 8, the term on Counts 5, 6, 7 and 8 to run concurrently with each other but consecutively to the life term. It is further adjudged that he be committed to the custody of the Attorney General of the United States for imprisonment for a period of five years on Count 9 to run consecutively to the life term and to the ten year term. It is further adjudged that he be committed to the custody of the Attorney General of the United States for a term of five years on Count 11 to run concurrently to the other sentence just imposed.

---

App. 35

On the verdict of the jury it is adjudged that Defendant, Yorie Von Kahl, be committed to the custody of the Attorney General of the United States – strike that – has been convicted of violations of 18 United States Code Sections 1111, 1114 and 2 as charged in Counts 1 and 2 of the Indictment; that he's been convicted of violation of 18 United States Code Sections 111, 1114 and 2 as charged in Counts 5, 6, 7 and 8 of the Indictment; that he has been convicted of violation of 18 United States Code Sections 1071 and 2 as charged in Count 9 of the Indictment; that he's been convicted of violation of 18 United States Code Section 371 as charged in Count 11 of the Indictment. It is further adjudged that the Defendant, Yorie Von Kahl, be committed to the custody of the Attorney General of the United States for life on Counts 1 and 2, the terms to run concurrently; that [33] he be committed to the custody of the Attorney General of the United States for imprisonment for a term of ten years on each of Counts 5, 6, 7 and 8, which terms will run concurrently but consecutively to the life term. That he be committed to the custody of the Attorney General of the United States for a term of five years on Count 9, term to run consecutively to the ten year term and to the life term; that he be committed to the custody of the Attorney General of the United States for a term of five years on Count 11, the term to run concurrently to the five, ten and life terms.

On the verdict of the jury it is adjudged that Defendant, David Ronald Broer, has been convicted of violation of 18 United States Code Sections 1071 and 2 as charged in Count 9 of the Indictment; that he's been convicted of violation of 18 United States Code Section 371 as charged in Count 11 of the Indictment. It is further adjudged that Defendant, David Ronald Broer, be committed to the

11

Only a single sentence, on page 5 of the 28-page brief in support of his Petition, identified the speaker of statements reproduced at pages 33-34 of the Petition's Appendix: "At sentencing, AUSA Crooks affirmed that the verdicts on Counts One and Two were for 'murder' (App. at 33-34)."  Appellant's App. 179 (Von Kahl Pet. 5).  This citation to the Appendix did not direct the reader to the language about contrition or justification.

### D.    The Summary

BNA publishes the *Criminal Law Reporter* ("CLR"), a publicly distributed news periodical reporting on developments in criminal cases, law and policies.[7] Appellant's App. 161 (Def.'s SUMF ¶ 15).  The "Cases Docketed" section summarizes cases filed before the Supreme Court.  *Id.*  BNA staff member Alisa Johnson, who holds both J.D. and L.L.M. degrees from Georgetown University and who had been with BNA for thirteen years at the relevant time, reviewed the Petition and drafted a one-paragraph summary for the CLR.  Appellant's App. 283-284 (Johnson Decl. ¶¶ 2-3, 5).

In a declaration, Johnson averred that her usual practice was to review a petition such as Von Kahl's, including the appendix, and then write a summary of the ruling below and refer in that summary to the questions presented for review by the Supreme Court.  Appellant's App. 162 (Def.'s SUMF ¶¶ 19-20); Appellant's

---

[7] Von Kahl does not dispute BNA Statement of Undisputed Material Facts ¶¶ 15-16.  Appellant's App. 301 (Pl.'s SUMF ¶ 34).

App. 284 (Johnson Decl. ¶¶ 5-6).  Johnson did not do any further reporting, such as interviews or legal research, and relied on no document other than the Petition and Appendix.  *Id.*; Appellant's App. 162-163 (Def.'s SUMF ¶ 21); Appellant's App. 285 (Johnson Decl. ¶¶ 10-11); Appellant's App. 266-267 (Moore Decl. ¶¶ 5-7).  Johnson then customarily submitted the drafted summary to Managing Editor Michael Moore for review.  Appellant's App. 163 (Def.'s SUMF ¶ 22); Appellant's App. 284 (Johnson Decl. ¶ 7); Appellant's App. 265-266 (Moore Decl. ¶¶ 2-4).  Neither Moore nor Johnson recalls Moore's suggesting or making any changes to the Summary of the Von Kahl Petition.  Appellant's App. 163 (Def.'s SUMF ¶ 23); Appellant's App. 284-285 (Johnson Decl. ¶ 8); Appellant's App. 266 (Moore Decl. ¶ 4).  At the time she prepared the Summary, Johnson "understood from the way in which the text on page 33 of the appendix was formatted that all of the transcript excerpts on pages 33-35 of the appendix were of the sentencing judge's comments."  Appellant's App. 285 (Johnson Decl. ¶ 10).

On August 17, 2005, BNA published in the CLR a summary of Von Kahl's Petition that stated, in pertinent part:

> **04-1717 In re Kahl**
> *Homicide – Murder of U.S. marshals – Jury instructions – Sentencing*
>
> Ruling below (D. N.D., 6/24/83):
>
> > Petitioner, who showed no hint of contrition and made statements to press that he believed that murders of

13

U.S. marshals in course of their duties were justified by religious and philosophical beliefs, is committed to custody of the U.S. Attorney General for imprisonment for life based on his convictions on two counts of violating 18 U.S.C. §§ 1111, 111, and 2, terms to run concurrently; for 10-year term of imprisonment on each of four counts on which he was convicted of violating 18 U.S.C. §§ 111[1], 1114, and 2, which terms will run concurrently but consecutively to life term; to five-year term of imprisonment for violating 18 U.S.C. §§ 1071 and 2, term to run consecutively to 10-year term and life term; and to five-year term of imprisonment on his conviction for violating 18 U.S.C. § 371, term to run concurrently to five-year, 10 year, and life terms.

Appellant's App. 274.  The next paragraph of the summary set forth the legal questions presented in the mandamus petition.  The summary of Von Kahl's Petition prepared by Johnson was one of eighteen published by BNA in the "Cases Docketed" section of the August 17, 2005 issue of the CLR.  Appellant's App. 164 (Def.'s SUMF ¶ 25); Appellant's App. 273-277.

### E.    The Clarification & Complaint

Two years after publication, on July 3, 2007, Von Kahl's counsel wrote to BNA to seek clarification that Von Kahl had not made the references to lack of contrition and justification for the killings.  Appellant's App. 164 (Def.'s SUMF ¶ 26).  Nothing in the letter from Von Kahl's counsel put BNA on notice that the particular words in question from the sentencing transcript were in fact spoken by the AUSA rather than the sentencing judge.  Although Moore believed the summary accurately reflected the contents of the Petition, he determined that it

14

would be appropriate to run a clarification to make clear that the remarks in question had been made about Von Kahl by others, not by Von Kahl himself. Appellant's App. 164-165 (Def.'s SUMF ¶ 28); Appellant's App. 255 (July 19, 2007 Ltr. from BNA to Bachrach, with Clarification); Appellant's App. 266-267 (Moore Decl. ¶¶ 5-7, 9). Stating that "the summary of the sentencing judge's ruling below should have begun: 'Petitioner who was said to have believed that the murders were justified,'" the clarification conveyed that Von Kahl was not the source of these allegations. Appellant's App. 165 (Def.'s SUMF ¶ 29); Appellant's App. 280-281 (Clarification as published).

Months later, Von Kahl himself wrote to BNA's then-General Counsel complaining that the Clarification appeared to attribute to the sentencing judge a statement actually made at the sentencing hearing by the prosecutor, marking the first time in their communications with BNA that Von Kahl or his counsel had identified the prosecutor as the speaker. Appellant's App. 165 (Def.'s SUMF ¶ 30); Appellant's App. 259 (Jan. 7, 2008 Ltr. from Von Kahl to BNA); Appellant's App. 267 (Moore Decl. ¶ 10). Neither Von Kahl's lawyer nor Von Kahl in their letters to BNA pointed to the reference at page 5 of the Petition identifying AUSA Crooks as the speaker at the pertinent pages of the Appendix.

Von Kahl thereafter filed suit, alleging that certain statements in the Summary as well as the Clarification were false and defamatory:

15

(1) that Von Kahl "showed no hint of contrition"

(2) that Von Kahl "made statements to press that he believed that murder of U.S. marshals in course of their duties were justified"; and

(3) that Von Kahl believed murders were justified "by religious and philosophical beliefs."

Appellant's App. 25, 28, 30 (Compl. ¶¶ 11-12, 17-25, 28-32). Von Kahl further alleged that the Clarification was false and defamatory because it attributes to the sentencing judge, rather than to the prosecutor, the statement that Von Kahl believed the murders were justified.[8] *Id.* 26-27, 31-32 (Compl. ¶¶ 14, 16, 40-44).

F.    **Prior Proceedings**

On September 13, 2011, the district court (Roberts, J.) denied BNA's initial motion to dismiss the complaint or for summary judgment, finding that the statements at issue did not qualify for protection under the fair reporting privilege. Appellant's App. 39 (ECF No. 26). On March 31, 2013, the district court denied BNA's motion for reconsideration of the 2011 decision and for judgment on the pleadings, concluding that the plaintiff was not libel-proof, that the reference to Von Kahl's lacking contrition was not protected opinion, and that the plaintiff's

---

[8] Von Kahl also alleged that it was false and defamatory to have said that he was "committed to custody … based on his convictions on two counts of violating 18 U.S.C. §§ 1111, 1114, and 2." Appellant's App. 30 (Compl. ¶ 32). This claim, however, was dismissed by Judge Roberts, who held that this statement was not actionable because it was true. Appellant's App. 153 (ECF No. 53 at 20).

16

complaint did not fail to allege facts plausibly establishing that BNA acted with actual malice.  Appellant's App. 134 (ECF No. 53).  However, the court did clarify that, while not entitled to summary judgment on the pleadings or as a matter of law, BNA could raise the fair report privilege "going forward."  The court held that Von Kahl was a limited purpose public figure and denied Von Kahl's claim that the statements in the CLR were libel *per se*, holding that the CLR summary did not falsely impute that Von Kahl was convicted of a crime.

## G.     The District Court's Order Denying Summary Judgment

The case was subsequently reassigned to Judge Ketanji Brown Jackson. Discovery was exchanged and Von Kahl declined the opportunity to take depositions of BNA employees.  BNA sought summary judgment in March 2014 on several grounds.  BNA argued that Von Kahl had not met the high burden of demonstrating that a reasonable jury could find substantial falsity by clear and convincing evidence, because "the substance, gist [and the] sting" of the challenged statements were true, citing Von Kahl's own published statements and his testimony at trial and sentencing to show his lack of contrition and justification for his acts, as well as the sentencing judge's citation to his lack of concern for the victims and their families as an "aggravating factor."  ECF No. 62, Memo. at 14-20.  BNA also argued that, even if the CLR contained false statements, Von Kahl had not met his high burden of showing, by clear and convincing evidence, that

17

BNA knew the statements were false or had serious doubts as to the truth.  *Id.* at 21-30.

The district court concluded in its decision of September 9, 2014, that there was a genuine issue of material fact as to whether the summary and clarification were substantially true as to what the judge may have believed.  The court further concluded that, because BNA's description of Von Kahl's Petition misattributed to the judge one statement in fact made by the prosecutor, those "discrepancies" between the Petition and BNA's summary "are sufficient to raise a genuine dispute of material fact regarding whether BNA acted with reckless disregard with respect to the truth or falsity of the statements in its summary."  Appellant's App. 335 (Summary Judgment Order 19).  The court declined to reconsider whether the fair report privilege required summary judgment.[9]

On Von Kahl's cross-motions for reconsideration and summary judgment, the district court declined to reconsider the prior decision that the statements were not libel *per se* because they did not falsely impute the criminal conduct for which plaintiff was convicted.  Appellant's App. 325-328 (Summary Judgment Order 9-12).  The court also rejected summary judgment for Von Kahl on the issue of collateral estoppel, preserving BNA's right to raise that defense.  *Id*. at 329-331

---

[9] BNA does not raise the issues of falsity or fair report privilege on this interlocutory appeal, but preserves the right to raise those issues in the event there is an appeal after further proceedings before the district court.

18

(Summary Judgment Order 13-15). Citing Von Kahl's numerous unsuccessful challenges to his underlying conviction and sentence, the court held that BNA was "likely to establish" that Von Kahl "had previously litigated that issue and that, as a result, any potential window to raise it here is now closed." *Id*.

### H.    Certification of Interlocutory Appeal

BNA moved for certification to seek immediate review of the Summary Judgment Order because the district court's decision was contrary to controlling precedent that holds that good faith mistakes that result from simply misreading an underlying source document, particularly an ambiguous court record, cannot – without more – constitute actual malice. ECF No. 90, Mot. Certify. On August 21, 2015, the district court granted BNA's request to certify this issue for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b), on the grounds that there is a "difference of opinion" as to whether Von Kahl has met his burden on summary judgment based on just the mistaken attribution without more, and "an immediate appeal with respect to Plaintiff's defamation claim would materially advance this litigation." Appellant's App. 343 (Certification Order 5). The district court also stayed the case pending determination of BNA's petition. *Id*. at 344 (Certification Order 6).

BNA thereafter petitioned this Court to grant interlocutory review. Von Kahl cross-petitioned seeking review of whether the district court correctly held he

was a limited purpose public figure and whether the statements in suit were libel *per se.*  He also sought review of whether BNA was "properly treated as a media defendant entitled to protection under *New York Times v. Sullivan,*" and whether his constitutional rights "outweigh" BNA's.  On March 14, 2016, this Court granted BNA's Petition and Von Kahl's Cross-Petition.  Appellant's App. 345.  The Court "directed the parties to address in their briefs the question of which issues in the cross-petition may properly be considered on appeal.  *See Yamaha Motor Corp.*, *U.S.A. v. Calhoun,* 516 U.S. 199, 205 (1996)."

## SUMMARY OF THE ARGUMENT

In this libel action, Von Kahl alleges that he was defamed by a BNA news digest reporting on his petition for a writ of mandamus in the Supreme Court.  As a limited purpose public figure, Von Kahl must come forward with "concrete," "affirmative evidence" that would allow a reasonable jury to conclude with "convincing clarity" that BNA acted with actual malice because it entertained serious doubts about the truth of the statements or it published those statements with a high degree of awareness of their falsity.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 256, 257.  Von Kahl failed to meet his burden and the district court erred in not granting summary judgment.

The First Amendment mandates that a limited purpose public figure, like Von Kahl, may recover for injury to reputation only on clear and convincing proof

20

of "actual malice," a subjective state of mind the Supreme Court has defined as "knowledge of … fals[ity] or … reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). To prove reckless disregard for the truth the plaintiff has the burden of pleading and ultimately proving that the defendant made the statements with a "high degree of awareness of their probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). The actual malice standard thus imposes a heavy burden on plaintiffs to protect First Amendment rights. It "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

That exacting standard was not met here and the district court's order denying BNA summary judgment must be reversed, because mistakes that result from a simple misreading of a source document cannot constitute actual malice "[n]o matter how gross the untruth" absent clear and convincing evidence "that the lie was a knowing one, or uttered 'in reckless disregard of the truth.'" *Washington Post Co. v. Keogh*, 365 F. 2d 965, 970 (D.C. Cir. 1966) (Wright, J.) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (Stewart, J. concurring)).

Here, an ambiguous excerpt of legal proceedings was misinterpreted and one off-point reference in a lengthy legal document was overlooked, resulting in misattribution to the judge of an observation made by the prosecutor. Courts have

21

uniformly held as a matter of law that this kind of unintentional error, even if careless, does not come close to actual malice. BNA's Summary of an ambiguous court document, though reflecting a misconception as to the speaker's identity, "was not enough to create a jury issue of 'malice'" under the *New York Times v. Sullivan* standard. *Pape*, 401 U.S. at 279. Such "errors of fact" and "errors of interpretation," even when resulting in misattribution "to a more authoritative official source," are squarely within "the zone of protection" of the actual malice standard. *Id*. at 285, 290-91. Moreover, because BNA's CLR digest was simply a summary of a court filing, BNA had no obligation to investigate other court records and failure to do so does not demonstrate actual malice. *St. Amant*, 390 U.S. at 733. Plaintiff has not offered any evidence, much less clear and convincing evidence, that the error was deliberately "fabricated," that the interpretation was "so inherently improbable that only a reckless person would have [published it]," or that BNA had "obvious reason to doubt" that the speaker whose identity was adjacent to a passage in the Appendix filed in the Supreme Court by Von Kahl's counsel was indeed the speaker who uttered those words. *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003).

A probing review of libel claims and the proper application of summary procedures provides the press with "freedom from the harassment of lawsuits," thus avoiding the "tend[ency] to become self-censors." *Keogh*, 365 F.2d at 968.

22

For this reason, District of Columbia courts have vigorously affirmed that "[i]n the First Amendment area, summary procedures are even more essential." *Id.*

Finally, Von Kahl has indicated that he will challenge the district court's determination that he is a limited purpose public figure and thus subject to the daunting actual malice standard. While Von Kahl may properly seek review of the district court's decision, Plaintiff – who was convicted of killing two U.S. Marshals – was properly deemed a limited purpose public figure as to BNA's publication regarding his sentencing, his religious and philosophical justifications for the killings, and his ongoing efforts to overturn his conviction.

*First*, the shoot-out that took the lives of two U.S. Marshals, which led to nationwide media coverage and a significant prison sentence, constitutes a public controversy. *Second*, Von Kahl's active role in the tragic shoot-out and in the public controversy surrounding the event, his involvement with Posse Comitatus, and his repeated efforts to obtain judicial relief from his conviction and sentence, including in our nation's highest court, are significant and not tangential. And *third*, whether Von Kahl expressed remorse for his crimes, and whether he was motivated by deeply held religious or philosophical beliefs associated with the anti-tax, anti-Semitic, and racist group of which he was a member, are germane to the defamation alleged in his suit. Accordingly, this Court should affirm the district court's determination that Von Kahl is a limited purpose public figure who

failed to meet the exacting actual malice standard required to prevail on his defamation claim.

## ARGUMENT

### A.    Standard of Review

This Court reviews *de novo* district court rulings on motions for summary judgment, viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in their favor. *See Forman v. Small*, 271 F.3d 285, 291 (D.C. Cir. 2001); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255; Fed. R. Civ. P. 56(c).

Whether the record is sufficient to support a finding of actual malice is a question of law. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989). As explained by the Supreme Court, "[t]he question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact." *Bose Corp. v. Consumers Union*, 466 U.S. 485, 511 (1984). Thus, "[j]udges, as expositors of the Constitution," are not merely to determine whether the finder of fact could reasonably find such "convincing clarity" to exist, but "must independently decide whether the evidence in the record is sufficient to cross th[is] constitutional threshold." *Id.* In considering a decision denying

24

summary judgment, the reviewing court must determine whether plaintiff has met

his burden of offering "concrete," "affirmative evidence" that would allow a

rational finder of fact to find actual malice – i.e., knowledge that the statement in

question was false or with a high degree of awareness of its falsity – by clear and

convincing evidence. *Anderson v. Liberty Lobby*, 477 U.S. at 254, 256, 257.

**B.      The District Court Incorrectly Determined That Von Kahl Had Met His Burden of Coming Forward With Clear and Convincing Evidence of Actual Malice**

As the Supreme Court has recognized, "[t]here is a significant difference

between proof of actual malice and mere proof of falsity." *Bose*, 466 U.S. at 511.

Courts have consistently held that mistakes that result from misreading a document

cannot constitute actual malice where, as here, the only evidence relied upon to

demonstrate actual malice is the mistake itself.  Such mistakes fit comfortably in

the "breathing space" for journalists reporting on matters of public concern, where

"erroneous statement is inevitable." *N.Y. Times Co.*, 376 U.S. at 271-72.  As this

Court has explained, a public-figure plaintiff can support a libel claim only with

allegations that a defendant was subjectively aware the story was "(1) fabricated;

(2) so inherently improbable that only a reckless person would have put [it] in

circulation; or (3) based wholly on an unverified anonymous telephone call or

some other source that [plaintiff] has obvious reasons to doubt." *Lohrenz*, 350

F.3d at 1283.  Sitting *en banc*, this Court observed, "For [the actual malice]

25

standard to be met, the publisher must come close to wilfully blinding itself to the

falsity of its utterance." *Tavoloureas*, 817 F.2d at 776 (internal citation and

quotation marks omitted).  Not surprisingly, district courts routinely grant

summary judgment on actual malice grounds and this Circuit routinely affirms.[10]

The district court here erred in not granting BNA summary judgment based solely

---

[10] *E.g.*, *Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003) (affirming summary judgment); *McFarlane v. Sheridan Square Press*, 91 F.3d 1501 (D.C. Cir. 1996) (affirming summary judgment); *Moldea v. N.Y. Times Co.*, 22 F.3d 310 (D.C. Cir. 1994) (affirming summary judgment); *Washington Post Co. v. Keogh*, 365 F.2d 965 (D.C. Cir. 1966) (affirming summary judgment); *Jankovic v. International Crisis Grp.*, 72 F. Supp. 3d 284 (D.D.C. 2014), appeal docketed, No. 14-7178 (D.C. Cir. argued Feb. 10, 2016); *Parsi v. Daioleslam*, 890 F. Supp. 2d 77 (D.D.C. 2012); *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103 (D.D.C. 2011); *Klayman v. Judicial Watch, Inc.*, 628 F. Supp. 2d 112 (D.D.C. 2009); *Stark v. Zeta Phi Beta Sorority, Inc.*, 587 F. Supp. 2d 170 (D.D.C. 2008); *LaPointe v. Van Note*, 2006 WL 3734166 (D.D.C. Dec. 15, 2006); *OAO Alfa Bank v. Center for Pub. Integrity*, 387 F. Supp. 2d 20 (D.D.C. 2005); *Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*, 383 F. Supp. 2d 32 (D.D.C. 2005); *Sculimbrene v. Reno*, 158 F. Supp. 2d 8 (D.D.C. 2001); *Ruf v. American Broad. Cos.*, 2000 WL 35433488 (D.D.C. Feb. 22, 2000); *Q Int'l Courier, Inc. v. Seagraves*, 1999 WL 1027034 (D.D.C. Feb. 26, 1999); *Alade v. Borg-Warner Protective Servs. Corp.*, 28 F. Supp. 2d 655 (D.D.C. 1998); *Foretich v. American Broad. Cos.*, 1997 WL 669644 (D.D.C. Oct. 17, 1997); *Caudle v. Thomason*, 992 F. Supp. 1 (D.D.C. 1997); *Ellis v. Time, Inc.*, 1997 WL 863267 (D.D.C. Nov. 18, 1997); *Lane v. Random House, Inc.*, 985 F. Supp. 141 (D.D.C. 1995); *Buendorf v. National Pub. Radio, Inc.*, 822 F. Supp. 6 (D.D.C. 1993); *Secord v. Cockburn*, 747 F. Supp. 779 (D.D.C. 1990); *White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990); *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29 (D.C. Cir. 1990); *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595 (D.C. Cir. 1988); *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C. Cir. 1988); *McBride v. Merrell Dow & Pharms., Inc.*, 613 F. Supp. 1349 (D.D.C. 1985), *aff'd in relevant part*, 800 F.2d 1208 (D.C. Cir. 1986); *Joseph v. Xerox Corp.*, 594 F. Supp. 330 (D.D.C. 1984).

on "discrepancies" between the Von Kahl's Petition and BNA's Summary, and the court's order should therefore be reversed.

### 1. Courts Uniformly Find No Actual Malice For Mistakes Resulting From A Simple Misreading Of A Document

The district court erred in relying solely on BNA's misattribution of the sentencing transcript to deny BNA summary judgment.  This Court has held that "when a writer is evaluating or giving an account of inherently ambiguous materials or subject matter, the First Amendment requires that the courts allow latitude for interpretation."  *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 315 (D.C. Cir. 1994) (reversing prior decision and affirming summary judgment).  Mistakes resulting from the misreading or misinterpretation of ambiguous source material is insufficient evidence of actual malice.

The Supreme Court's decision in *Pape* is highly relevant.  In that case, Time Magazine wrote about a report by the United States Commission on Civil Rights and quoted a police abuse complaint, which was specifically described in the Commission report as "alleged," "without indicating in any way that the charges were those made by [the complainant] rather than independent findings of the Commission."  401 U.S. at 282, 290.  The Court held that the claim that this misattribution to "a more authoritative source" by the omission of the word "alleged" – very similar to the misattribution to the judge, instead of the prosecutor, here – was not sufficient to go to a jury, noting *New York Times Co. v.*

27

*Sullivan*'s "constitutional zone of protection for errors of fact caused by negligence" as well as "errors of interpretation." *Id*. at 290, 291.  The Court found that, although Time Magazine's report involved an "admittedly conscious and deliberate" omission, not merely "good faith error or mere negligence" (which is the most Von Kahl could prove here), there still was not sufficient clear and convincing evidence of actual malice. *Id.* at 285.  The Court rejected the view (which the district court erroneously held here) that "once a jury was satisfied that the interpretation was 'wrong,' the error itself would be sufficient to justify a verdict for the plaintiff." *Id.* at 291.  As the Court concluded, "Time's conduct reflected, at most, an error of judgment." *Id.* at 292.

The facts in *Pape* and Time's omission are, if anything, far more egregious than the unintentional mistake here.  In *Pape*, Time essentially edited out the word "alleged" because other parts of the document suggested that, notwithstanding the use of the word "alleged," the Commission actually believed the allegations to be true.  Here, BNA simply – and without making an intentional edit – mistook a portion of a sentencing transcript as the comments of the judge.  *See Bose*, 466 U.S. at 511, 513 (even though review of stereo speakers misdescribed sound, "[t]he statement in this case represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the New York Times rule applies").  If Pape did not have a claim against Time, Von Kahl certainly has no claim against BNA.

28

Thus, BNA's misreading of the transcript excerpt appended to Von Kahl's Petition, which did not denote the speaker of text regarding his lack of contrition, cannot – without clear and convincing evidence of "serious doubt" on BNA's part – create a jury issue of actual malice. *See also, e.g.*, *Moldea*, 22 F.3d at 315.

Indeed, courts throughout the country uniformly find no actual malice for mistakes where, as here, a defendant simply misreads a document or overlooks or forgets a key fact. *See, e.g.*, *Orr v. Argus-Press Co.*, 586 F.2d 1108, 1116 (6th Cir. 1978) (public figure could not establish actual malice where statements contained in newspaper article interpreting plaintiff's indictment were not shown to have been made with knowledge of their falsity or with a reckless disregard for the truth); *Marcone v. Penthouse Int'l Mag. for Men*, 754 F.2d 1072 (3d Cir. 1985) (reversing libel judgment for plaintiff who had been mistakenly identified as a drug defendant, even though documents in reporter's possession, which were evidently misread, showed that another man with a completely different name was actually the drug defendant); *Dunn v. Gannett N.Y. Newspapers, Inc.*, 833 F.2d 446, 452 (3d Cir. 1987) (affirming grant of summary judgment where plaintiff failed to establish newspaper's mistaken attribution of Spanish word "cerdos," meaning "pigs," to mayor in connection with mayor's comments regarding city's litter problem was result of actual malice); *Buendorf v. National Pub. Radio, Inc.*, 822 F. Supp. 6 (D.D.C. 1993) (no genuine issue as to actual malice where a journalist

29

knew the truth, but misidentified the man who had saved President Ford's life and had later been identified as a homosexual); *Vazquez Rivera v. El Dia, Inc.*, 641 F. Supp. 668 (D.P.R. 1986) (granting summary judgment where defendants published a photograph of the plaintiff with a caption stating that the district attorney had filed charges against him, even though the accompanying article would have shown the defendants that the caption named the wrong person); *Simmons Ford, Inc. v. Consumers Union*, 516 F. Supp. 742 (S.D.N.Y. 1981) (granting summary judgment because no actual malice where magazine article evaluating automobile contained inaccurate statement regarding seat belts). As the New York Court of Appeals observed in affirming summary judgment in favor of a defendant newspaper despite its mistaken rewrite that plaintiff's medical license had been "revoked," when the underlying news article said only that revocation had been sought:

> Other than the fact that the [publication] contains two erroneous statements … there is no evidence that anyone at the paper seriously doubted the truth of the complained-of statements or was highly aware that they were incorrect prior to publication. Evidence of falsity does not equate with proof of actual malice.

*Kipper v. NYP Holdings Co.*, 912 N.E.2d 26, 30-31 (N.Y. 2009) (affirming reversal of denial of summary judgment).[11]

---

[11] *Accord Martin v. N.Y. Daily News*, 951 N.Y.S.2d 87 (N.Y. Sup. Ct. 2012), *aff'd*, 990 N.Y.S.2d 473 (N.Y. App. Div. 1st Dep't 2014) (although defendant's

At bottom, misattribution of a quoted statement "does not create a jury issue of actual malice" because it merely "demonstrate[s] that a publisher misinterpreted his source material." *Liberty Lobby, Inc. v. Anderson,* No. 81-2240, 1991 WL 186998, at *8 (D.D.C. May 1, 1991). *See also* 1 Hon. Robert D. Sack, *Sack on Defamation*, § 5:5.2[B] at 5-94 - 5-95 (4th ed. 2010) (collecting cases) ("It is not enough for a plaintiff to prove that the defendant … made a mistake in interpreting events, documents, or sources, or selected the wrong term or language to establish actual malice.").[12]

---

misreading of a legal complaint was "sloppy and careless," summary judgment on grounds of no actual malice affirmed), *leave to appeal denied*, 21 N.E.3d 569 (N.Y. 2014); *Jenkins v. Liberty Newspapers Ltd. P'ship*, 971 P.2d 1089 (Haw. 1999) (upholding grant of summary judgment on actual malice ground where newspaper mistakenly identified attorney plaintiff as target of State Insurance Commissioner's investigation even though reporter had correct name in document; holding that plaintiff failed to adduce evidence that reporter or newspaper entertained serious doubts as to the truth of the challenged statement); *Torgerson v. Journal/Sentinel, Inc.*, 563 N.W.2d 472, 482 (Wis. 1997) (summary judgment granted because insufficient evidence of actual malice where articles provided "a rational interpretation of ambiguous statements"); *Glover v. Herald Co.*, 549 S.W.2d 858 (Mo. 1997) (en banc) (reversing trial court's judgment in favor of an alderwoman to whom statements made at a meeting were incorrectly attributed, even though copywriter had the correct facts available to him); *Farrakhan v. NYP Holdings*, 638 N.Y.S.2d 1002, 1008 (N.Y. Sup. Ct. 1995) (granting summary judgment because even if newspaper defendants "misinterpreted" statement, "such misinterpretation does not arise to a level of constitutional malice"), *aff'd*, 656 N.Y.S.2d 726 (N.Y. App. Div. 1st Dep't 1997), *leave to appeal denied*, 691 N.E.2d 803 (N.Y. 1997).

[12] Similarly, technical errors in legal nomenclature are of no legal consequence and do not establish actual malice. *E.g.*, *Simonson v. United Press Int'l, Inc.*, 654 F.2d 478, 482 (7th Cir. 1981) (defendant substituted the word

The misattribution at issue in this case does not evidence actual malice.  The Appendix to Von Kahl's Petition consisted of excerpts from his sentencing hearing with only the judge's name appearing at the beginning of the excerpts, but omitted any other identification of the speakers.  In this manner, the document was ambiguous insofar as it suggested that the speaker of some of the text – the judge, the only speaker identified in the transcript – was the speaker of all of the text.  The single sentence in the 28-page Petition that identified the speaker at pages 33-34 of the Appendix was in a totally different context.  Appellant's App. 179 (Von Kahl Pet.).  The Petition, at page 5, states only: "At sentencing, AUSA Crooks affirmed that the verdicts on Counts One and Two were for 'murder' (App. at 33-34)."  *Id.*  This citation to the Appendix did not direct the reader to the language about contrition and its significance becomes apparent only with 20/20 hindsight.  Indeed, it previously eluded even Von Kahl's counsel, who initially wrote to BNA without mentioning that this language was spoken by a prosecutor.  Appellant's App. 251 (July 3, 2007 Ltr. from Bachrah to BNA).  He said only that it was not spoken by Von Kahl.  *Id.*  Even when Von Kahl wrote BNA six months later and

---

"rape" for the technically correct term "sexual assault"); *Dostert v. Washington Post Co.*, 531 F. Supp. 165 (N.D. W.Va. 1982) ("guilty" substituted for "nolo contendere"); *Piracci v. Hearst Corp.*, 263 F. Supp. 511, 515 (D. Md. 1966) ("possession of marijuana" substituted for "delinquency due to the act of possessing marijuana"), *aff'd*, 371 F.2d 1016 (4th Cir. 1967); *Read v. Phoenix Newspapers, Inc.*, 819 P.2d 939 (Ariz. 1991) ("firing a gun" substituted for "exhibiting a gun").

said for the first time that this language was spoken by the AUSA, he did not cite to this reference in his own Petition. Appellant's App. 259 (Jan. 7, 2008 Ltr. from Von Kahl to BNA).

Significantly, the stiff sentence imposed on Von Kahl (two life sentences plus 15 years) reflected the judge's conclusion, stated in a part of the transcript that Von Kahl and his attorneys omitted from the Appendix, "that there was no concern for victims," which the judge cited as an "aggravat[ing] factor." Appellant's App. 242-243 (Sentencing Tr. 29:18-22, 30:1-5). Thus, BNA's Summary was an inadvertent, but understandable, misinterpretation of the transcript excerpt that was included. *Pape*, 401 U.S. at 289, 291. Given the harsh sentence, the serious nature of the crime, and the judge's description of Von Kahl's lack of concern, the misattribution hardly rises to the level of a "material difference" sufficient to establish substantial falsity, much less that BNA knew it was false.[13] *Air Wisconsin Airlines Corp. v. Hoeper*, 134 S. Ct. 852, 864-66 (2014) ("[W]e have long held that actual malice requires material falsity.").

Thus, whether or not BNA's error was careless, it does not evidence that defendant "made [the false publication] with a high degree of awareness of probable falsity," or must have "entertained serious doubts as to the truth" of the

---

[13] And, given Von Kahl's own statements and writings on his anti-government beliefs, it can reasonably be argued that the statement at his sentencing – that Von Kahl justified the killings on his philosophical beliefs – was not actually false.

statement.  *St. Amant*, 390 U.S. at 731 (citations and internal quotation marks

omitted).  *See also Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 83-84 (D.D.C. 2012)

(granting summary judgment on finding of no actual malice even though defendant

was "sloppy in his reporting, either omitting ellipses, slightly misquoting the

underlying source, or failing to put a citation in the appropriate place"); *Ellis v.*

*Time, Inc.*, No. Civ. A. 94-1755, 1997 WL 863267, at *8, *10 (D.D.C. Nov. 18,

1997) (granting summary judgment on finding that minor misstatement

"[a]ttributing a statement that was true of one meeting to the other meeting," and

photographer's misstatement of the ages of boys depicted in photos did not

establish actual malice because "[s]uch minor errors surely do not approach a

showing that the [article] was published with knowledge of their falsity");

*Jankovic*, 72 F. Supp. 3d at 313 (organization's purportedly mistaken reliance on

United States frozen assets list did not demonstrate that organization published

report linking Serbian businessman to Serbian war criminal with actual malice;

even if organization mistakenly relied on list, it amounted to nothing more than a

failure to investigate).

### 2.    The Record As A Whole Negates A Finding of Actual Malice

There is simply no evidence, beyond BNA's mistake, supporting Von Kahl's

suit.  The challenged statement at most implies that the sentencing judge (rather

than the prosecutor) found that Von Kahl expressed no contrition or remorse for

the murders of two U.S. Marshals.  With respect to this issue, there is no evidence – let alone clear and convincing evidence – that BNA had "serious doubts as to [its] truth" at the time it published.  *St. Amant*, 390 U.S. at 731.  On the contrary, BNA had no doubts about the accuracy of its report on Von Kahl's Petition, given both the ambiguous manner in which the sentencing transcript was reproduced in the Appendix and the harsh sentence the judge imposed.

Specifically, the following facts are undisputed:

- BNA's "Cases Docketed" feature for the CLR merely summarizes petitions filed with the U.S. Supreme Court and does not purport to serve as investigative or in-depth reporting.  Appellant's App. 161 (Def.'s SUMF ¶ 15).

- BNA staff member Alisa Johnson reviewed Von Kahl's 2005 Petition and drafted a one-paragraph Summary report for the CLR.  Appellant's App. 284 (Johnson Decl. ¶¶ 4-6).

- Johnson's usual practice was to review a petition such as Von Kahl's, including the appendix, and then write a summary of the ruling below based on the petition and tie that summary to the questions presented for review to the Supreme Court.  Appellant's App. 284 (Johnson Decl. ¶ 5).

- Johnson does not do any further reporting, such as interviews or legal research, and relies on no document other than the petition itself. Appellant's App. 284 (Johnson Decl. ¶ 6).

- After drafting a summary for the CLR, Johnson customarily submitted the draft to Managing Editor Michael Moore for review – a procedure she followed in this case.  Appellant's App. 284 (Johnson Decl. ¶ 7).

- Neither Moore nor Johnson recalls Moore suggesting or making any changes to the Summary of the Von Kahl Petition.  Appellant's App. 284 (Johnson Decl. ¶ 7); *id.* 266 (Moore Decl. ¶ 4).

- The portions of the sentencing transcript included in the Appendix contained only one name – Chief Judge Paul Benson, at the beginning of the transcript – and no other designation of the speakers at the hearing. Appellant's App. 285 (Johnson Decl. ¶ 10).

- The excerpt included statements at pages 34-35 that were clearly made by the judge as he pronounced the sentences, and there is no language at pages 33-34 (containing the relevant statements) that is in any way inconsistent with the judge's being the speaker on those pages as well. Appellant's App. 285 (Johnson Decl. ¶ 10).

- At page 5 in the Petition is a reference to the AUSA speaking at pages 33-34 of the Appendix, but not about a lack of contrition or justification for the murders.  Appellant's App. 179 (Von Kahl Pet.).

In sum, the format of the excerpt in the Appendix with the judge's name at the beginning; the judge clearly being the speaker pronouncing what was a harsh sentence; and no other speaker identified, led the BNA employees to believe that "all of the transcript excerpts at pages 33-35 of the appendix were of the sentencing judge's comments."  Appellant's App. 285 (Johnson Decl. ¶ 10).

This record is the antithesis of actual malice, a standard that is intended to insulate even demonstrably negligent publishers from liability.  "'No matter how gross the untruth, the [actual malice] rule deprives a defamed public [figure] of any hope for legal redress without proof that the lie was a knowing one or uttered in reckless disregard of the truth.'"  *Keogh*, 365 F.2d at 970 (citation omitted).  *See also N.Y. Times Co.*, 376 U.S. at 287 (no actual malice on part of defendant in publishing advertisement containing false information without first checking its accuracy against information in newspaper's files); *St. Amant*, 390 U.S. at 730 (no jury question of actual malice presented based upon defendant's having relied solely upon affidavit of union dissident for allegation and having also "failed to verify the information with those in the union office who might have known the facts"); *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 252 (1st Cir. 2000) ("Even

37

assuming [author] was careless and reached a mistaken conclusion, that is not enough for actual malice.") *Jankovic v. Int'l Crisis Grp.*, 72 F. Supp. 3d 284, 309 (D.D.C. 2014), appeal filed, No. 14-4178 (D.C. Cir., argued Feb. 10, 2016).

Von Kahl's arguments and the district court's decision thus do not address whether BNA in fact entertained serious doubts as to the truth of the challenged statement, which is the subjective standard at the heart of the actual malice inquiry. The standard for actual malice is not what a "reasonable person" or a "prudent publisher" would do, nor can it be defined as "an extreme departure from professional standards." *Harte-Hanks*, 491 U.S. at 665; *McFarlane*, 91 F.3d at 1508. Notwithstanding his access to the available federal court discovery mechanisms, Von Kahl has provided no such evidence in support of his defamation claim.[14] *See Keogh*, 365 F.2d at 969 ("The unimpeached Post personnel depositions are dispositive" as to "publication with actual knowledge,").

Von Kahl has not shown that the conduct of BNA or its reporter and editor even remotely approached actual malice. *Tavoulareas*, 817 F.2d at 789 ("[A]ctual malice does not automatically become a question for the jury whenever the plaintiff introduces pieces of circumstantial evidence tending to show that the

---

[14] While Plaintiff chose not to depose BNA employees, he did take discovery by way of document requests, interrogatories, and requests for admission and did not seek additional discovery in order to respond to BNA's Motion for Summary Judgment. *See* ECF No. 89, Pl.'s Mot. Leave Late Submission Additional Written Disc. Reqs. BNA's lack of knowledge is thus "unimpeached."

defendant published in bad faith," which "would be inadequate to ensure correct application of both the actual malice standard and the requirement of clear and convincing evidence"). Here, Von Kahl failed to meet the standard this Court established in *Lohrenz*, to come forward with evidence that the mistake was "fabricated" or "inherently improbable," or that the source – the Appendix filed in the Supreme Court by Von Kahl and his counsel – would cause BNA to have "an obvious reason to doubt." 350 F.3d at 1283. To the contrary, the statement, while indeed erroneous, was an inadvertent, good faith misinterpretation of an ambiguous court document.

Instead of coming forward with clear and convincing evidence that BNA seriously doubted the truth of the Summary it published, Von Kahl has argued that BNA's staff should have conducted an investigation to review the entire sentencing transcript from his 1983 criminal trial to verify the speaker of the statement at issue. Von Kahl's allegation of a failure to investigate is insufficient as a matter of law. Actual malice is a subjective standard, focused on a defendant's actual awareness of falsity. An alleged failure to conduct an investigation thus cannot plausibly establish actual malice unless the disputed statement was patently unbelievable on its face, something Von Kahl could never prove and has not even alleged.

39

As the Supreme Court underscored in *Harte-Hanks*, the actual malice issue is not whether a publisher "could have" investigated further, but whether the publisher had a subjective awareness of the statement's probable falsity at the time of publication. 491 U.S. at 667. Even under circumstances where a failure to investigate would constitute "'an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers,'" that failure does not establish actual malice, unless the publisher had "'obvious reasons to doubt'" the truth of the information. *Id.* at 666, 688 (citations omitted). The law is well established that the failure to investigate, without more, does not constitute actual malice.[15]

Von Kahl has also argued that the evidence of record is sufficient for the district court to have determined that BNA's misattribution of the statement at his sentencing constituted "purposeful avoidance of the truth," and thus established clear and convincing evidence of actual malice, but he cites, as the only evidence of "purposeful avoidance," BNA's failure to notice the reference in his Petition to the pages of the Appendix. Answer Pet. Interlocutory Appeal 12 (citing *Harte-*

---

[15] *St. Amant*, 390 U.S. at 733; *Lohrenz*, 350 F.3d at 1285 (affirming summary judgment where no actual malice when news organization did not investigate further even in the face of denials). *See generally* 1 Hon. Robert D. Sack, *Sack on Defamation*, § 5:5.2 at 5-90 to 5-95 (4th ed. 2010) (collecting cases) (failure "to investigate," failure "to obtain plaintiff's comments," failure to "present an objective picture," selective reporting of some facts but not others, belief in truth of information "despite the existence of a contradictory source" are all insufficient to constitute actual malice).

*Hanks*, 491 U.S. at 692). As an initial matter, describing BNA's conduct as failing to notice the Petition's reference to the Appendix pages is simply another way of saying that BNA was at most negligent in misattributing the statements to the judge, and as noted *supra* at 27-34, such negligent errors do not demonstrate actual malice.

Moreover, Plaintiff's reliance on *Harte-Hanks* is inapt. In that case, the defendant newspaper, relying upon a single source, had accused a candidate for public office of using "dirty tricks" to influence a grand jury investigation so as to cast doubt upon his opponent. The newspaper failed to interview the only witness who could credibly verify or undermine the source's account and failed to review two audiotapes that could easily have verified or disproved the allegations. *Id.* at 682-83. The Supreme Court held that the evidence supported the jury's finding of actual malice because it was "likely that the newspaper's inaction was a product of a **deliberate decision** not to acquire knowledge of facts that might confirm the probable falsity of [the] charges." *Id.* at 692 (emphasis added). Here, there is no evidence that BNA made a "deliberate decision not to acquire knowledge" or "had an obvious reason to doubt" its source – the Petition and Appendix prepared by Von Kahl's counsel and submitted to the Supreme Court. *Lohrenz*, 350 F.3d at 1283. *Cf. McFarlane*, 91 F.3d at 1510 ("[I]f a defendant has reason to doubt the veracity of its source, then its utter failure to examine evidence within easy reach

41

or to make obvious contacts in an effort to confirm a story would be evidence of its reckless disregard.").

There is no evidence in this undisputed record that BNA, its writer, or the editor who worked on the summary took any deliberate action to avoid looking at the full transcript or the single sentence in the Petition referring to the prosecutor talking about another subject. Indeed, as discussed *supra* at 32-33, even Von Kahl's own counsel did not notice the misattribution. Because the evidence shows, at most, negligence on the part of BNA, and does not "come close" to showing that BNA "wilfully blinding itself to the falsity," Plaintiff cannot prove actual malice. *Tavoloureas*, 817 F.2d at 776.

In a misguided attempt to point to something other than the mistake itself as proof of actual malice, Von Kahl has argued that BNA's Clarification to its original summary provides the necessary additional evidence. The Clarification made clear that it was not Von Kahl, but a third party who made the statements to which BNA's summary referred – exactly the clarification that Von Kahl's counsel had asked for. The Clarification underscores that BNA did not realize until Von Kahl's counsel contacted them two years after publication – and certainly did not realize at the time of publication – that the relevant references were not made by the judge. *McFarlane*, 91 F.3d at 1508 (actual malice must "necessarily be drawn

42

solely upon the basis of the information that was available to *and considered by* the defendant *prior* to publication") (emphasis added).

BNA's publication of the Clarification does not serve as evidence of actual malice as Von Kahl has asserted. Just the opposite. The Clarification suggests the absence of actual malice. *Logan v. District of Columbia*, 447 F. Supp. 1328, 1332 (D.D.C. 1978) (correction evidence of no actual malice); *Hoffman v. Washington Post Co.*, 433 F. Supp. 600, 605 (D.D.C. 1977) (fact that newspaper published retraction was "significant and tends to negate any inference of actual malice"), *aff'd without opinion*, 578 F.2d 442 (D.C. Cir. 1978). But even if BNA had not published a clarification, that would still not establish actual malice, which is measured at the time of the original publication. *N.Y. Times Co.*, 376 U.S. at 286; *McFarlane*, 91 F.3d at 1515.

## C.   The District Court Correctly Determined That Von Kahl Was A Limited Purpose Public Figure

### 1.   Scope of Review

Whether the district court, in its 2013 decision, properly concluded that Plaintiff is a limited purpose public figure is material to interlocutory review of the trial court's application of the actual malice standard in its 2014 decision. BNA thus agrees with Plaintiff that this foundational question may be a proper subject of this Court's *de novo* review of the certified order denying summary judgment as to actual malice. *Yamaha*, 516 U.S. at 205; *Armstrong v. Bush*, 924 F.2d 282, 296

43

(D.C. Cir. 1991) (on interlocutory appeal of certified order appellate court has jurisdiction to review the entire order, not just the questions certified as controlling).

In *Yamaha*, the Supreme Court dealt with the breadth of review properly conducted by a court of appeals under 28 U.S.C. § 1292(b).  516 U.S. at 204.  The Court held that an appellate court conducting interlocutory review of a certified order "may address any issue fairly included within the certified order because 'it is the ***order*** that is appealable, and not the controlling question identified by the district court.'"  *Id.* (emphasis in original; citation omitted).   Whether Von Kahl is a limited purpose public figure is "logically interwoven with the explicitly identified issue" of the application of the actual malice standard, and thus may be considered by this Court on review of the Summary Judgment Order.  *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1196 (D.C. Cir. 2005).  That review is *de novo*.  *Id*. at 1197 (citing *Cicippio–Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1031 (D.C. Cir. 2004)).

BNA will address the appealability of any other issues Von Kahl may assert on cross-appeal in its cross-appellee brief.[16]

---

[16] At this time, Von Kahl has not submitted a statement of issues for his cross-appeal.

## 2.    Von Kahl Is A Limited Purpose Public Figure

The public figure doctrine reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co.*, 376 U.S. at 270.  Under this approach, those who, like Von Kahl, have chosen to participate in public debate or taken action that invites public scrutiny, must accept a substantially greater risk of public comment.  Despite Von Kahl's insistence that no public controversy existed over his crime, lack of remorse, or long-term incarceration, or over his repeated attempts to obtain post-conviction relief, Von Kahl is a quintessential limited-purpose public figure, as the district court correctly found.

The determination whether a plaintiff is a public figure is informed by two "touchstones" first identified in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). *First*, the public figure plaintiff is an individual who has pursued a course of conduct that foreseeably "'invite[s] attention and comment.'" *Tavoulareas*, 817 F.2d at 773 (quoting *Gertz*, at 344).  "'[B]y reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention,' public figures voluntarily 'run[] the risk of closer public scrutiny ….'" *Id.* at 772 (quoting *Gertz*, at 342, 344).  *Second*, the public figure plaintiff enjoys "'access to the channels of effective communication'" and thus has the ability to respond to falsehoods and mitigate harm.  *Id.* (quoting *Gertz*, at 344).

45

With these principles in mind, this Court in *Waldbaum v. Fairchild Publications, Inc.* established a three-part limited purpose public figure inquiry. *First*, the court must determine whether there was a pre-existing public controversy. 627 F.2d 1287, 1296 (D.C. Cir. 1980). *Second*, it must analyze the plaintiff's role in the controversy, which must be more than "[t]rivial or tangential." *Id*. at 1297. *Third*, the court must assess whether the alleged defamation is germane to the plaintiff's participation in the controversy. *Id*. at 1298. Having "voluntarily exposed [himself] to increased risk" of public comments, *Gertz*, 418 U.S. at 345, Von Kahl easily satisfies each of the three factors for defining a public figure and the district court's decision should therefore be affirmed.[17]

### a.    The Public Controversy

A public controversy for First Amendment purposes is "a dispute that … has received public attention because its ramifications will be felt by persons who are not direct participants." *Waldbaum*, 627 F.2d at 1296. The controversy need not be of interest to nearly everyone, but rather, it must be "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way."

---

[17] *See OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 43 (D.D.C. 2005) ("The public figure question is one of law that the Court must resolve itself, looking at the facts 'taken as a whole, through the eyes of a reasonable person.'") (citation omitted).

*Id.  See also Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1554 (4th Cir. 1994).

As set forth in *Waldbaum*, "[t]o determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question" and should consider "if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment."  627 F.2d at 1297. The district court undertook that inquiry and found that "the February 13, 1983 shoot-out was a newsworthy event in which plaintiff played an active role."  Appellant's App. 152 (ECF No. 53 at 19).

The shoot-out was part of a newsworthy public controversy.  Von Kahl's father was a member of a notorious anti-tax group and the son's anti-tax views were inextricably intertwined with the shoot-out, which occurred when federal law enforcement authorities came to arrest Von Kahl's father in connection with his tax conviction.  The national media gave widespread coverage to the controversy over the shoot-out, but even beyond the shoot-out itself, the public controversy also includes Von Kahl's association with the Posse Comitatus and his connection with the group's anti-government beliefs.  To identify the controversy in the case before it, the *Waldbaum* court ventured well beyond the four corners of the five-sentence report concerning the plaintiff's termination as president of a supermarket

cooperative, and examined an evidentiary record that demonstrated that the co-op was often in the news, known for innovation, and "pathbreaking marketing policies" that were "the subject of public debate within the supermarket industry and beyond." 627 F.2d at 1299. Thus, the *Waldbaum* court confirmed that a public controversy is determined by viewing the publication in a wider context, to assess whether and how the words on the page relate to the pre-existing debate.

This approach has been consistently taken by this Court in the decisions since *Waldbaum* and has not been limited to the content of the publication. *See Tavoulareas*, 817 F.2d at 774 (reviewing voluminous "Public Figure Index" that included hundreds of press reports, to determine that the controversy into which president of Mobil Oil had inserted himself was one concerning the nation's "[p]ublic policy toward the oil industry"); *OAO Alfa Bank*, 387 F. Supp. 2d at 43 (article focused on U.S. corporate influence-peddling; controversy identified as "corruption in post-Soviet Russia and the future of Western aid and investment in the country"); *Jankovic*, 72 F. Supp. 3d at 301-03 (public controversy existed concerning progress of political and economic reform in Serbia when non-profit organization's report linking Serbian businessman to president was published, supporting finding that businessman was limited-purpose public figure for purposes of his defamation action against organization).

Thus, the first prong of the limited purpose public figure test – the existence of a public controversy – is easily met.

### b.     Von Kahl's Voluntary Participation in the Public Controversy

The second prong of the *Waldbaum* inquiry requires the court to analyze the plaintiff's involvement in the controversy.  "Trivial or tangential participation" is not sufficient.  627 F.2d at 1297.  Based on a careful review of "'a sampling of publicity' about the shoot out, as well as articles and other materials pertaining to the criminal proceedings and plaintiff's conviction and appeals," Appellant's App. 151 (ECF No. 53 at 18), the district court determined that Von Kahl was a limited purpose public figure.  Von Kahl had more than a "trivial or tangential participation" in the shoot-out.  Plaintiff was convicted of two counts of second-degree murder for the deaths of two U.S. Marshals and is serving two life sentences as a result.  More so than the air traffic controller in *Dameron*, whose role was "relatively passive" but nonetheless rendered him a limited purpose public figure, Von Kahl "was at the center of a controversy involving the loss of [several] lives" in a "widely publicized" interaction with "an arm of the government."[18]  *Dameron v. Washington Mag., Inc.*, 779 F.2d 736, 741-42 (D.C. Cir. 1985).

---

[18] Even if Von Kahl lacked pervasive notoriety before his involvement in the shoot-out and the resulting criminal case, general notoriety is not the measure for a limited purpose public figure.  *See, e.g.*, *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 20-21 (1st Cir. 2011) (citations omitted) ("[D]ebate [over degree of fame]

Von Kahl's proven access to public attention, even from prison, further bolsters the conclusion that he is a limited purpose public figure. Plaintiff's efforts to market his own publications for sale confirm that he has access to public platforms in support of his causes. Where, as here, the plaintiff "is shaping or is trying to shape the outcome of a specific public controversy, he is a public figure for that controversy." *Waldbaum*, 627 F.2d at 1298 n.32. *See Hatfill v. N.Y. Times Co.*, 532 F.3d 312, 322-24 (4th Cir. 2008) (bioterrorism expert "limited-purpose public figure" with respect to controversy surrounding bioterrorism and nation's preparedness for biological attack where he voluntarily assumed role of special prominence in controversy by serving as frequent instructor and media commentator on subject and used anthrax attacks as platform to intensify his message).

Von Kahl's relationship to the public controversy had not diminished as of 2005 when the CLR was published, not only given substantial commentary concerning the incident and the long-lasting influence of the extreme anti-tax

---

has no relevance" in a dispute over "a *limited*-purpose public figure" who is defined "in terms of the controversy that he has stepped into."). Thus, in *Lohrenz*, 350 F.3d at 1274, a largely unknown fighter pilot, who had never initiated media contact, was a limited purpose public figure who played a "central role" in the controversy about women serving in combat roles. Similarly, the plaintiff in *Clyburn v. v. News World Commc'ns, Inc.* was not widely known but came to the attention of the defendants only after they began their investigation and his "name surfaced as a contractor with the D.C. government who was also a friend of" the mayor. 705 F. Supp. 635, 637 (D.D.C. 1989), *aff'd*, 903 F.2d 29 (D.C. Cir. 1990).

group Posse Comitatus, but also because of Von Kahl's repeated efforts to overturn his conviction through his many appeals. These efforts included the 2005 Petition in the Supreme Court more than 20 years after his conviction, which was the subject of the publication in suit. *See supra* 8-12. Additionally, Von Kahl's publication of books or pamphlets regarding his case, the shoot-out and his philosophical beliefs – which he markets on Amazon – further confirms that his role in the public controversy is ongoing. *See Hobbs v. Pasdar*, 682 F. Supp. 2d 909, 930 (E.D. Ark. 2009) (accused murderer held to be public figure where he "had access to the media prior to the alleged defamation and his role was not limited to defending himself" and "[i]n fact, he has clearly taken advantage of his role in the controversy by selling the rights to the life stories of himself … and by attempting to sell his journal as a book"). Indeed, one such work came out in 2004, just a year before the 2005 Summary in the CLR. *See supra* 7-8.

### c. The Challenged Statement Is Germane to Von Kahl's Participation in the Controversy

Finally, the court must determine whether "the alleged defamation was germane to the plaintiff's participation in the controversy." *Tavoulareas*, 817 F.2d at 773. Courts routinely find that a criminal defendant is a limited purpose figure as to news items concerning their case. *E.g.*, *Berry v. Nat'l Broad. Co.*, 480 F.2d 428, 431 (8th Cir. 1973) ("Clearly, killing another person is a matter of public interest" and constitutes an action that causes perpetrator to "become a public

figure."); *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 861 (5th Cir. 1978) (plaintiff named in various government reports as having Mafia ties and who had been acquitted on criminal charges was public figure); *Hobbs*, 682 F. Supp. 2d at 927  (killings of three eight-year-old boys and alleged wrongful convictions of those charged with murder was public controversy and accused held to be public figure); *Harris v. Quadracci*, 856 F. Supp. 513, 517 (E.D. Wis. 1994) ("[D]efendant in a criminal case would be a public figure as to news items concerning his case."), *aff'd*, 48 F.3d 247 (7th Cir. 1995); *Price v. Chicago Mag.*, 1988 WL 61170, at *4 (N.D. Ill. June 1, 1988) (plaintiff prison inmate "is an involuntary public figure because of his conviction and imprisonment for several crimes").

In this case, the alleged defamatory statement is clearly germane to Von Kahl's participation in the controversy.  The statements at issue involve Plaintiff's motivation for committing the murders for which he was convicted and the extent to which he feels remorse for the killings.  *See, e.g.*, *Logan*, 447 F. Supp. at 1331 (finding prisoner challenging publication concerning his crimes a public figure required to show actual malice).  Whether Von Kahl believed that the murder of two U.S. Marshals was justified by his anti-government beliefs, which is the precise question he raises in this defamation action, is germane to the controversy surrounding the shoot-out, his conviction, and his life sentence, as well as the

larger controversy regarding the actions and beliefs of the Posse Comitatus and the movement of anti-government, anti-tax believers with which he has affiliated himself. Whether BNA's summary of his Petition libeled Von Kahl by suggesting that the sentencing judge, as opposed to the prosecutor, found that he showed no contrition for the killings of two U.S. Marshals and justified the murders based on his deeply held beliefs, is directly related to the public controversy with which he had a prominent role, and to his challenge in the Supreme Court regarding his conviction and sentence.

Upon an assessment of the *Waldbaum* factors, the district court correctly concluded that "plaintiff is a limited purpose public figure who ultimately must demonstrate actual malice in order to prevail in this action." Appellant's App. 152 (ECF No. 53 at 19). That conclusion should be affirmed by this Court.

## CONCLUSION

For the foregoing reasons, The Bureau of National Affairs, Inc. respectfully requests that this Court reverse the district court's order denying BNA summary judgment.

Dated: May 19, 2016

Respectfully submitted,
DAVIS WRIGHT TREMAINE LLP

By: /s/ Laura R. Handman
Laura R. Handman (Bar No. 444386)
Lisa B. Zycherman (Bar No. 495277)

1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
Tel: (202) 973-4200; Fax: (202) 973-4499
laurahandman@dwt.com
lisazycherman@dwt.com

LEVINE SULLIVAN KOCH
  & SCHULZ, LLP
Jay Ward Brown (Bar No. 437686)
1899 L Street, NW
Suite 200
Washington, DC 20036-5514
Telephone: (202) 508-1100
Facsimile: (202) 861-9888
jbrown@lskslaw.com


*Attorneys for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B).  This brief is submitted in 14-point Times New Roman font and contains 12,806 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).


Dated: May 19, 2016                  */s/ Laura R. Handman*
                                     Laura R. Handman

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of May, 2016, I filed the foregoing Defendant-Appellant / Cross-Appellee The Bureau of National Affairs, Inc.'s Corrected Opening Brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit via ECF.

I also hereby certify that on this 19th day of May, 2016, I served the foregoing by United States first-class mail, postage prepaid upon the following:

> Yorie Von Kahl
> Prisoner No. 04565-059
> United State Penitentiary
> P.O. Box 3000
> Pine Knot, KY  42635
>
> Gregory J. Dubinsky
> Boies, Schiller & Flexner LLP
> 5301 Wisconsin Avenue, NW
> Washington, DC  20015

> By:  /s/ Laura R. Handman
>        Laura R. Handman